ALABAMA & N. O. TRANSP. CO. et al. v. DOYLE et al.

(District Court, E. D. Michigan, S. D. January 28, 1914.)

No. 33.

1. CONSTITUT.JNAL LAW (§ 48*)—STATUTES—VALIDITY—DETERMINATION.
A federal court must not declare a state statute unconstitutional on evenly balanced or doubtful considerations, but, before doing so, must be clearly satisfied of its invalidity.
[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 46; Dec. Dig. § 48.*]

2. BANKS AND BANKING (§ 311*)—SECURITIES—REGULATION—STATUTES—VALIDITY.
Pub. Acts Mich. 1913, No. 143, providing for the regulation and supervision of foreign and domestic investment companies, their agents and other persons, corporations, and associations selling stocks, bonds, or other securities, etc., cannot be sustained as a tax law or a mere license law, since it does not purport to be the former, and, while it carries some features of the latter, its dominant characteristics are prohibitory.
[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1215-1223; Dec. Dig. § 311.*]

3. CONSTITUTIONAL LAW (§ 277*)—DUE PROCESS OF LAW—"PROPERTY"—"LIBERTY"—RIGHT TO BUY AND SELL SECURITIES.
Corporate, partnership, and individual securities and obligations to pay money are property, and the right to issue and sell or buy and sell the same is liberty, within the due process clause of the federal Constitution.
[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 762, 766, 949; Dec. Dig. § 277.*
For other definitions, see Words and Phrases, vol. 6, pp. 5693-5728; vol. 8, pp. 7768-7770; vol. 5, pp. 4126-4130; vol. 8, pp. 7705, 7706.]

4. CONSTITUTIONAL LAW (§ 296*)—DUE PROCESS OF LAW—POLICE POWER—SALE OF STOCKS, BONDS, NOTES, AND EVIDENCES OF INDEBTEDNESS—REGULATION.
Pub. Acts Mich. 1913, No. 143, providing for the regulation of foreign and domestic investment companies in the sale of stocks, bonds, and evidences of indebtedness within the state, in so far as it authorized the Commission to prohibit a sale of securities in case it should find that the sale in all probability would result in loss to the purchasers, etc., regardless of whether the securities were based on sufficient property to be probably good, was not a proper exercise of the police power to conserve the public welfare, and was therefore unconstitutional as a deprivation of property or liberty without due process of law.
[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 825-838, 840-846; Dec. Dig. § 296.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. CONSTITUTIONAL LAW (§ 295*)—DUE PROCESS OF LAW—SALE OF SECURITIES.

Pub. Acts Mich. 1913, No. 143, regulating the sale of securities in that state and providing that there can be no sale for a period of 30 days, after the dealer or issuing company has furnished to the public commission the required data, is not within the police power of the state and is invalid as a deprivation of property without due process of law.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 841; Dec. Dig. § 295.*]

6. STATUTES (§ 64*)—PARTIAL INVALIDITY—PENALTIES.

Pub. Acts Mich. 1913, No. 143, attempting to regulate the sale of securities in that state, imposes various penalties for violations, including five years' imprisonment and $5,000 fine. *Held* that, while such excessive penalties may afford a reason for temporarily enjoining the enforcement of the law until its validity can be determined, the penalties, being separable, do not furnish ground for pronouncing the whole law invalid.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 58–66, 195; Dec. Dig. § 64.*]

7. COMMERCE (§ 57*)—INTERSTATE COMMERCE—INTERFERENCE—SALE OF SECURITIES—REGULATION.

Pub. Acts Mich. 1913, No. 143, providing for the regulation and supervision of foreign and domestic investment companies, their agents, and other persons selling securities in Michigan, constitutes a direct interference with interstate commerce in stocks, bonds, and commercial paper which constitute a part of interstate trade, and is therefore invalid.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 72–76, 88, 90, 92–102; Dec. Dig. § 57.*]

8. CONSTITUTIONAL LAW (§ 62*)—LEGISLATIVE POWER—DELEGATION.

Pub. Acts Mich. 1913, No. 143, providing for the regulation and supervision of securities to be sold in Michigan, in so far as it created the Michigan Securities Commission, an administrative board, to supervise business affected with a public interest, was not invalid as a delegation of legislative or judicial authority.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 94–102; Dec. Dig. § 62.*]

9. STATUTES (§ 64*)—PARTIAL INVALIDITY—EFFECT.

Pub. Acts Mich. 1913, No. 143, providing for the regulation and supervision of sales of securities in Michigan, having been held unconstitutional in so far as it gave the Securities Commission power to forbid the sale of securities at less than what they thought was a proper price, in so far as it directly and substantially burdened interstate commerce, and also in so far as it forbade sales within 30 days after information concerning the securities was requested, etc., such provisions affected the entire scheme of the act so that no part of it could be sustained.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 58–66, 195; Dec. Dig. § 64.*]

In Equity. Consolidated action by the Alabama & New Orleans Transportation Company, the Continental & Commercial Trust & Savings Bank, N. W. Halsey & Co., H. L. Higginson and others, and A. B. Leach and others, against Edward H. Doyle and others, members of the Michigan Securities Commission, to restrain the execution of Pub. Acts Mich. 1913, No. 143, known as the "Blue Sky Law." On motion for a preliminary injunction. Granted.

Hal H. Smith, of Detroit, Mich., and Robert R. Reed, of New York City (Beaumont, Smith & Harris, of Detroit, Mich., and Caldwell, Masslich & Reed, of New York City, of counsel), for plaintiffs.

Grant Fellows, Atty. Gen., of Lansing, Mich., for defendants.

Before DENISON, Circuit Judge, and SESSIONS and TUTTLE, District Judges, under section 266 of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1162 [U. S. Comp. St. Supp. 1911, p. 236]), as amended March 4, 1913 (chapter 160, 37 Stat. 1013).

PER CURIAM. We take judicial notice of the common understanding that this "Blue Sky Law" was intended, as is said by the Attorney General, "to stop the sale of stock in fly-by-night concerns, visionary oil wells, distant gold mines and other like fraudulent exploitations." If just this intent had been carried into effect by the act as passed, these cases would not be here; but scrutiny of the law discloses additional and very different effects. It is not confined to corporations, but covers partnerships issuing, and individuals dealing in, securities; it does not relate alone to stocks, but as well to bonds, mortgages, and promissory notes; it is not limited to investment companies, as that term would ordinarily be defined, but extends the definition so that it may include most of the private corporations and partnerships in the United States; it does not cover fraudulent securities merely, but reaches and prohibits the sale of securities that are honest, valid, and safe; it does not simply protect the unwary citizen against fraudulent misleading, but it prevents the experienced investor from deliberately assisting an enterprise which he thinks gives sufficient promise of gain to offset the risk of loss, or which, from motives of pride, sympathy, or charity, he is willing to aid, notwithstanding a probability that his investment will prove unprofitable. Of course, not all of these results always follow; but some of them always may, and sometimes will. Take concrete instances. A merchandising partnership cannot borrow additional capital from its home bankers on long time notes (over nine months) unless the Commission approves. If a timber company is insolvent, no one can deal in its first mortgage or underlying bonds, though these bonds are perfectly good, are not in default and not likely to be, nor can the Commission permit such dealing if it would. A successful automobile or furniture company may not increase and sell its capital stock, save by the Commission's approval, and, if such a company has not been successful and the Commission thinks it is not likely to be, the company must liquidate; it will not be permitted to get new capital. If a company is organized to make and sell a new invention, and if the Commission thinks the enterprise will not succeed, the stock may not be sold, even to skilled bankers who have investigated thoroughly and still desire to buy. If, through local pride or in the effort to save an existing investment or for any indirect benefit to come, the citizens of a town wish to take stock or bonds in a local company, though knowing they are likely to lose their investment and being willing to take the chance, yet they may not; this law forbids.

With the economic wisdom of such a law, this court has nothing to do; all such considerations are for the Legislature. McLean v. Arkansas, 211 U. S. 539, 547, 29 Sup. Ct. 206, 53 L. Ed. 315; C., B. & Q. R. Co. v. McGuire, 219 U. S. 549, 569, 31 Sup. Ct. 259, 55 L. Ed. 328. The generally laudable and remedial purposes of the act are to be granted; but, in endeavoring to make it so all-embracing as they thought wise, its draftsmen, as we are forced to conclude, disregarded fundamental limitations imposed by the federal Constitution.

[1] We reach this result fully recognizing the rule [1] that a court must not make such a decision on any evenly balanced or doubtful considerations, but must be clearly satisfied of the law's invalidity; and we proceed to state the reasons which compel our conclusions.

It is necessary, first, to recite the substance of the law, which covers ten pages of the published statutes, and cannot be quoted at length. By its title it purports to—

"define and provide for the regulation and supervision of foreign and domestic investment companies, their agents and other persons, corporations and associations, selling the stocks, bonds or other securities issued by such investment companies; to protect the purchasers of the stocks, bonds or other securities issued by such investment companies; and to prevent fraud in the sale thereof; to create a commission to administer the provisions of this law; and to provide penalties for the violation thereof."

It then defines an investment company, foreign or domestic, as including every corporation, copartnership, company, or association which shall, either by itself or through others, sell or negotiate for the sale, in Michigan, of any stocks, bonds, or other securities issued by it. Excepted from this definition of investment companies are: Municipal corporations, banks, trust companies, building and loan associations, and corporations not for profit. Exempted from the "stock. bonds or other securities" affected by the act are: commercial paper running less than nine months; the securities of quasi public corporations, the issue of which is regulated by any public service commission; and real estate mortgages where the entire mortgage is sold with the notes secured thereby (ordinary trust mortgage bonds remaining within the act). The State Banking Commissioner, the State Treasurer, and the Attorney General are constituted a "Securities Commission." No investment company shall offer to sell any of its securities until more than 30 days after it has filed with the Commission full data regarding itself and its securities, and paid to the Commission one-tenth of 1 per cent. (with a maximum of $100) upon the face value of the securities for the sale of which permission is sought. The Commission shall examine the data filed with it, and may require such further information as it desires. If the Commission finds that the investment company is not solvent, or that its organization or plan of business is not fair, or that its proposed contracts or other securities are fraudulent or of such a nature that their sale would, in all probability, work a fraud upon the purchaser, or finds that such securities are of such a nature and character as would, in all probability,

[1] This rule may not always govern motions for preliminary injunction; but we now assume its full application.

result in loss to the purchaser, then the sale thereof is to be permanently prohibited. Every investment company (probably meaning any company which has ever, since the passage of the act, issued and sold its securities) must file with the Commission annual and special reports, must keep its books according to a prescribed system, shall be subject to inspection by the examiners of the Commission whenever the Commission desires, and must pay the cost of such examinations. A "dealer" is defined as any person, firm, copartnership, corporation, or association, not the issuer, who shall sell or offer for sale any of the securities issued by any foreign or domestic investment company within the act, or who shall profess or engage in the business of such selling; but the definition does not include the owner of such securities who is not the issuer, but who, for his own account, sells them, but the owner so selling is excluded from the class of "dealers" only if "such sale is not made in the course of continued and successive transactions of a similar nature." Dealers must be registered with the Commission, pay a registration fee of $50, furnish all requested information, and file and maintain lists of their authorized agents (at $3 each). No dealer shall offer for sale any securities unless the issuing investment company has complied with the law, or unless the dealer himself furnishes the information which would have been required from the investment company. In no case can any issue or sale be made of the stocks, bonds, contracts, or commercial paper covered by the act until 30 days have elapsed after the application and data are filed with the Commission; after which time, lacking objection by the Commission," the prohibition expires, and the sale is (tacitly) approved. Some violations of the act are made felonies punishable by not more than $5,000 fine and five years in the state prison; others are made misdemeanors punishable by not more than $1,000 fine and 90 days' imprisonment. The only power of review conferred on any court is that "the Supreme Court may review by certiorari any final order of the Commission."

This law is now attacked in five cases which, for the purposes of this motion, have been consolidated. The defendants have filed a motion to dismiss, in the nature of a demurrer, without other showing, and therefore this motion for a temporary injunction must be decided upon the properly pleaded allegations of the bills and the accompanying affidavits, from which the following additional and essential facts appear: The Alabama & New Orleans Transportation Company is a New York corporation, engaged in the transportation business upon the Gulf of Mexico and between the city of New Orleans, La., and the city of Tuscaloosa, Ala., with principal offices in the city of New York, and operating offices at New Orleans and Tuscaloosa. It owns steamboats, wharves, and docks. A part of its authorized capital stock, both common and preferred, has been issued, and a part of its authorized first and second mortgage bonds have also been issued and sold. Through its agents, it has offered its first and second mortgage bonds and preferred stock for sale and desires to make further sales in Michigan. The purchaser of its first mortgage bonds, already issued, desires to sell them in Michigan. It is solvent, its property is ample

to discharge all its obligations, its bonds and stock are valuable and the security therefor is amply sufficient, its business is profitable, the representations, upon which the sale of its bonds have been made, are true, its bonds and stock are of such a nature that the sale thereof will not work a fraud upon, nor, in all probability, cause a loss to, the purchaser, and the plan of the business is fair and promises a substantial profit from its operation. In the other cases, two of the plaintiffs are corporations and two are partnerships. All are nonresidents of Michigan, are engaged as "investment bankers" in buying and selling, through traveling agents and otherwise, stocks, bonds, and other securities affected by the act, have been so engaged for a considerable time, have invested large sums of money in, and have acquired a valuable good will connected with, their business, and have not misrepresented to their customers the character or value of the securities which they sell.

The objections urged against the act are: (1) That it deprives plaintiffs of their property in violation of the fourteenth amendment; (2) that it deprives plaintiffs of the equal protection of the laws in violation of the same amendment; (3) that it directly burdens interstate commerce; (4) that it delegates to the Commission legislative power and judicial power in violation of the Michigan Constitution; (5) that the title of the act is not confined to one object and does not express that object, as required by the Michigan Constitution.

[2] Before considering these questions, it is well to remember that this act is neither a tax law nor a mere license law. It does not purport to be the former; and, while it carries some of the nomenclature and some of the features of the latter, its dominant characteristics and effect are prohibitory. We may therefore disregard the principles and decisions which have sustained, as constitutional, various state tax laws and various state laws which merely licensed the carrying on of some business or occupation. With this elimination in mind, we proceed to the questions involved.

1. *Are plaintiffs deprived of their property or liberty without due process of law?*

[3] That this act does deprive plaintiffs of property, as well as of liberty, is clear. Their right to issue and sell, or to buy and sell, securities is "property" and "liberty" under the familiar definitions adopted by the Supreme Court of the United States as well as by the Supreme Court of Michigan.

"The liberty mentioned in that amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties, to be free to use them in all lawful ways, to live and work where he will, to earn his livelihood by any lawful calling, to pursue any livelihood or vocation, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying to a successful conclusion the purposes above mentioned." Allgeyer v. Louisiana, 165 U. S. 578, 589, 17 Sup. Ct. 427, 41 L. Ed. 832; Lochner v. New York, 198 U. S. 45, 25 Sup. Ct. 539, 49 L. Ed. 937, 3 Ann. Cas. 1133; Adair v. United States, 208 U. S. 161, 28 Sup. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764.

"The Legislature of the state is not empowered by the Constitution to regulate contracts between its citizens who are engaged in legitimate commercial

business, or to require any class of persons to pay a fee for the right to carry on business, or to give a bond to perform their contracts which other parties. may choose to make with them." People v. Berrien Circuit Judge, 124 Mich. 664, 667, 83 N. W. 594, 595 (50 L. R. A. 493, 83 Am. St. Rep. 352).

Indeed, we do not understand the Attorney General to question that the statute does operate to deprive plaintiffs of their liberty and property. He relies, rather, upon the principles stated by the Circuit Court of Appeals of this Circuit, speaking by Judge Cochran, in this language:

"In the first place, it is to be noted that a statute or ordinance depriving one of his liberty or property is not in violation of said amendment merely because of such deprivation. Either of three things is essential to bring the deprivation within the amendment. It must have no real or substantial relation to the public welfare, or the deprivation it provides for must be a deprivation without due process of law, or it must amount to a denial of the equal protection of the laws. If the statute or ordinance has a real and substantial relation to the public welfare, if it provides for a deprivation by due process of law, and if it affords an equal protection of the laws, it is valid, notwithstanding its enforcement will deprive a person subject thereto of his liberty or property." Grainger v. Douglass Park Club, 148 Fed. 513, 523, 78 C. C. A. 199, 209 (8 Ann. Cas. 997).

[4] The first vital question, then, must be whether the provisions of the statute have "real or substantial relation to the public welfare." This form of words is capable of a construction broader than may ultimately be approved (Noble Bank v. Haskell, 219 U. S. 104, 111, 580, 31 Sup. Ct. 299, 55 L. Ed. 341), but we take it as intended to be definitive of the police power, and so the extent of that power is the real question. It would be profitless to undertake any review of the decisions on this subject, or to try to adopt or to formulate any comprehensive and accurate definition of this phrase. It is enough, now, to remember that the prohibition in question has to do with transactions predominantly private, and not with those which are affected by a public interest, which arise from public grant or which exist by public sufferance. This statute does not deal with common carriers, grain elevators, or other enterprises of that class, nor distinctly with corporations, nor at all with saloons, itinerant peddlers, and the like. The issuing of commercial paper, stocks, or bonds by a private company to get money for its own business no one can suppose is a public or quasi public enterprise; the business of buying and selling stocks and bonds and other securities is no more "affected by a public interest" than is the business of buying and selling groceries. When we thus recall that the prohibition applies to a private business, the question at once presents itself whether frauds and opportunities for fraud sufficiently characterize the business to justify its entire prohibition save under drastic restrictions. We cannot shut our eyes to the fact, which all men know, that, as compared with the total dealings in securities covered and contingently prohibited by this act, those which may fairly be suspected to be of a fraudulent character are a very trifling proportion; and there is no reason to suppose that the percentage of fraud is any greater than in each of the ordinary business and professional occupations. Applying the principle announced by the Supreme Court

of Michigan in the Commission Dealers' Case,[2] it is not clear that any scheme of modified prohibition can be applied at all to this entire business. We do not need to go so far. It is to be presumed that this question was considered by the Legislature; it has (theoretically) been decided by the legislators; and we may not unnecessarily overrule that decision.

However, there are some features of the statute which are not even within the shadow of the police power. The first of these is the provision that no promissory note, bond, stock, contract, or other security shall be sold within the state unless the Commission thinks it is worth the price which is asked. The act does not put it quite so baldly, but the language can mean nothing else. If the Commission finds that the "sale will, in all probability, result in loss to the purchasers," the sale is prohibited. Unless the security is worth the price asked, the "sale will, in all probability, result in loss to the purchaser." This is the plain meaning of the words. In that event, the Commission has no power to permit the sale; and if, after such a finding, the property is sold to a careful purchaser, who is in no way misled, but buys just what he wants and pays what he thinks it is worth, the seller may be imprisoned for five years; and it would be quite immaterial that the Commission was wrong and that the security sold was in fact worth the price. The element of fraud is wholly eliminated from this part of the statute, and all the dependent police power to protect the citizen against fraud must concurrently disappear. No definition of the police power, which we have seen or which the industry of counsel has found, is broad enough to cover such a prohibition, and we are aware of no consideration which even plausibly supports its validity.

---

[2] "The business of buying and selling on commission has existed ever since commerce began. There are and always have been dishonest men engaged in it, as there are and always have been in every other branch of business. There are and always have been dishonest sellers, who will pack their produce in such a manner as to deceive. It would be as reasonable to require the latter to give bond to properly pack their produce. In every such case the common law provides an ample remedy for redress to the injured party for breach of contract. There is no more reason why a commission merchant should pay a license fee and execute a bond to pay his debts and to do his business honestly than there is that any other merchant should pay a like fee and file a like bond to properly do his business and pay his debts. The business requires no regulation, any more than any other mercantile pursuit. There is nothing in it hostile to the comfort, health, morals, or even convenience, of a community. It is carried on by private persons in private buildings, and in a manner no different from that in which the merchant selling hardware or groceries or dry goods carries on his business. The law can find no support in the police power inherent in the state. It is not like the liquor traffic, which, under the decisions of every court, is subject to the police power, because of the injury it does to the health, morals, and peace of the community, and may be prohibited altogether. Neither is there anything in it requiring regulation, as do hack drivers, peddlers, keepers of pawn shops, and the like. The Legislature of this state is not empowered by the Constitution to regulate contracts between its citizens who are engaged in a legitimate commercial business, or to require any class of persons to pay a fee for the right to carry on business, or to give a bond to perform their contracts which other parties may choose to make with them." People v. Berrien Circuit Judge, 124 Mich. 664, 667, 83 N. W. 594, 595 (50 L. R. A. 493, 83 Am. St. Rep. 352).

Of like effect and subject to like infirmity is the provision forbidding the sale of securities, if the Commission thinks that the company's organization or proposed plan of business is not "fair." Broader and vaguer language could not be chosen. It subjects to the practically uncontrolled discretion of the Commission every issue or general sale of stocks, bonds, or securities hereafter to be made in Michigan. For this and the provision regarding probable loss, we heard upon the argument and we find in the briefs no claim of justification on grounds of public welfare; and we know of none. They deprive plaintiffs of property, and they do not carry the semblance of "due process of law." It may be assumed that the officials who constitute the Commission are more experienced and wiser than two citizens who desire to buy and sell property, with which they are familiar, at the price they have agreed upon; it may be assumed that these officials can foresee the coming events which will bring loss or profit on a proposed investment; but it has never yet been supposed by any court or any text-writer that it was within the police power of a state to decide for its citizens the financial advisability of their investments, so long as the investors were not misled or deceived.[3]

[5] Still another limitation which we think wholly beyond the authority of the police power is this: During the period of 30 days after the application is made and data filed with the Commission, there can be no sale of the securities. The Commission is powerless to permit; any company which issues and sells or any dealer who sells is guilty of felony. This is the law, without regard to the character of the securities. They may be of the highest quality in every respect; the emergency requiring immediate sale may be extreme; these considerations cut no figure; the law proclaims a 30-day paralysis. If a company, perfectly solvent but in need immediately of ready money, arranges a bond issue and has people ready to purchase the bonds, nothing can be done for 30 days; in the meantime things must stop and the company, perhaps, must lose its credit and fail. Such a provision is an arbitrary and oppressive interference with the right of contract; it bears no "reasonable relation" to the public health or the public morals, or even to the "public welfare," in the broadest conceivable sense of that phrase.

The decisions on the Bulk Sales Laws (Lemieux v. Young, 211 U. S. 489, 29 Sup. Ct. 174, 53 L. Ed. 295; Kidd v. Musselman, 217 U. S. 461, 30 Sup. Ct. 606, 54 L. Ed. 839) are neither controlling nor closely analogous. For a retail dealer, who is seriously indebted, to sell his stock in bulk suddenly and without the general knowledge of his cred-

---

[3] We were told, upon the argument, that the Commission was not enforcing the law as it is written, but only so far as the Commission thought wise. It was said that all so-called standard securities might be sold without requiring full data and without waiting 30 days, and it was intimated that the provisions regarding "fairness" and "probability of loss" were only to be resorted to when the Commission thought the securities were fraudulent but did not wish to put its finding on that ground. In so far as these statements or intimations may be true, they only emphasize the inherently unlawful character of the Act and the temptation and opportunity for a rule of individual discretion and not of law.

itors is an unusual and abnormal thing. It is almost, perhaps quite, a badge of fraud in itself; and to provide that such sales shall be delayed a very brief time, perhaps five days, in order that notice may be given to individuals directly interested distinctly tends to protect the business community from fraud. Such a theory of the police power furnishes no support for thinking that the regular and normal course of dealings in one great branch of business may be suspended for 30 days.

2. *Does the act deprive plaintiffs of the equal protection of the laws?*

This is the second question stated by Judge Cochran; and the answer depends on whether the classifications adopted by the statute are justified by the rules of classification which have been considered in many cases by the Supreme Court of the United States. Plaintiffs, under this head, urge many detailed objections. They say that such distinctions as are attempted cannot lawfully be made between partnerships and individuals, between long-time and short-time paper, between ordinary mortgages and trust mortgages securing a bond issue, between the owner and the dealer, between stock subscriptions and stock sales, and in other particulars which we need not specify. We have not recited the statute fully enough to make all of these objections intelligible, because we do not decide them. Some are hypercritical; some are at least serious. For example, it is difficult to see why one rule should be applied to an individual who gives a trust mortgage upon his property securing a series of his notes and bonds, and a different rule to a partnership which does the same thing. However, we pass these objections by, as other grounds are clearer.

[6] Another reason urged why plaintiffs are deprived of equal protection of the laws is that the statutory penalties are so excessive that persons interested dare not make a test case in the ordinary way. Such terrorizing penalties furnish a reason why a court of equity may have jurisdiction to enjoin the enforcement of the law, temporarily, till its validity can be determined (Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. [N. S.] 932, 14 Ann. Cas. 764); but where the penalties are separable, as they are here, their possible invalidity may be a defense against their direct enforcement, but does not furnish ground for pronouncing the whole law invalid (Willcox v. Consolidated Gas Co., 212 U. S. 19, 53, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 395, 14 Sup. Ct. 1047, 38 L. Ed. 1014; L. & N. R. Co. v. Garrett, 231 U. S. 298, 34 Sup. Ct. 48, 58 L. Ed. ——; Grand T. Ry. Co. v. Mich. Ry. Com., 231 U. S. 457, 34 Sup. Ct. 152, 58 L. Ed. ——).

3. *Do the provisions of the act constitute a direct and substantial burden on interstate commerce?*

[7] It must be conceded that, if such burden is created, the act is, so far, void. We cannot doubt that stocks and bonds are now the subject of interstate commerce, and that shipments and sales of them, between the states, are interstate commerce. We do not find that this has been expressly held in any authoritative decision, but, in the present development of commerce, it would be regarded as obvious, save for the argument based upon Nathan v. Louisiana, 8 How. 73, 12 L.

Ed. 992 (involving foreign bills of exchange), and Paul v. Virginia, 8 Wall. 168, 19 L. Ed. 357 (involving insurance contracts).[4]   The former case really involved only the question whether a state tax or license fee could be imposed upon a citizen dealing in foreign bills of exchange.   Such a tax, under the rules now familiar, and even if made an incident attendant on interstate commerce, would often be only an indirect burden upon such commerce, and so would be valid. The special insurance contract involved in the latter case is essentially different from stocks, bonds, and commercial paper.   However, if either of these cases might otherwise be thought now controlling, we think the opinion in the Lottery Cases (188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492) requires the contrary result.   As to stocks, some distinctions from Lottery Cases can be drawn, because the certificates, in part, represent rights of membership; but we cannot appreciate the force of any considerations whereby it might follow that, although lottery tickets are the subject of interstate commerce, bonds and commercial paper are not.   They pass freely from hand to hand, title to many of them passing by delivery; they are subject to state taxation; they are protected by state statutes against larceny; in an increasing volume from year to year, they have come to take a most important place in the business and commerce of the country.   They satisfy, in every respect, the essentials of the definition in the Lottery Cases; indeed, they satisfy the more limited definition contended for in the minority opinion in that case.

If bonds and commercial paper and (probably) stocks are the subject of interstate commerce, are interstate dealings in them directly burdened by this law?   Dealings wholly by mail, in which the nonresident vendor only sends letters into the state, and, upon the end of the negotiations, sends the securities into the state to be there paid for, might escape the statute, not because its general language does not cover them, but because its operation might be limited to avoid the clear invalidity which would otherwise result.   However, we know that the great mass of business of this kind is done by traveling agents or solicitors for foreign investment bankers, brokers, and issuing corporations.   These solicitors and salesmen travel through the state and negotiate and close sales.   They may carry with them the stock certificates or bonds, or they may, on closing a sale, telegraph or write to the home office and have the securities sent over, either directly to the purchaser or to themselves, for delivery by them.   If the home office is at (e. g.) Chicago, the delay is for only a few hours.   The distinctions between these two methods (personal carrying by salesmen and sending home) are shadowy in principle and often negligible in practice.   We think the statute is clearly intended to be applied to this kind of business, by either method.   The law says, in section 18:

"It shall be unlawful for any corporation, copartnership, association, company, firm, person or agent to sell or offer for sale, or attempt to sell at any place within this state or to any person within this state, stocks, bonds, or other securities, * * * unless, etc. * * * No investment company or

---

4 See the latest application and review of these and their dependent cases in N. Y. Life Ins. Co. v. Deer Lodge County, 231 U. S. 495, 34 Sup. Ct. 167, 58 L. Ed. ——, Dec. 15, 1913.

dealer shall sell or offer for sale at any place or to any person within this state any stocks, bonds, or other securities issued to any investment company, unless, etc."

Indeed, upon the argument, the Attorney General frankly admitted that the statute must be interpreted to cover these methods of business by nonresidents, and it is this very feature for the protection of which at least four of the consolidated bills are filed.

This brings us to the inquiry whether the burden is direct and so forbidden, or indirect and so permitted. It is established by many familiar cases, some of the more recent of which are cited in the margin,[5] that, although certain exercises of the police power (of which ordinary licensing laws and food inspection laws are the most familiar examples) do burden interstate traffic in legitimate articles of commerce, yet, because the law is within the police power, the burden is considered not sufficiently substantial and direct to make the law invalid. Whether there may be a field for exercise of police power, which exercise is legitimate from all other points of view and yet forbidden as against interstate commerce under the rule which has its latest development in Crenshaw v. Arkansas, 227 U. S. 389, 399, 33 Sup. Ct. 294, 57 L. Ed. 565, Rogers v. Arkansas, 227 U. S. 401, 409, 33 Sup. Ct. 298, 57 L. Ed. 569, and Adams Express Co. v. City of N. Y., 232 U. S. 14, 34 Sup. Ct. 203, 58 L. Ed. ——, we need not consider. We may assume, for the purposes of this opinion, that this inquiry, whether the burden is "direct," is only another form of the question whether the act is within the police power.

Is this a mere licensing law? So far as it affects the investment company, we see no similitude. Engaging in a business is not regulated or permitted; it is the proposed individual transaction which is the subject of scrutiny. The investment company receives no license in substance or in form. If it fully complies with the law, and the issue and sale of stocks and bonds are approved, and if the next year or the next month it wishes to make another issue which may be substantially similar, it is forbidden to do so until there is another submission and another tacit approval. To call such provisions the licensing of an occupation or business is a misnomer.

As to dealers, there is more of the form of license. They are required to register and to pay a registration fee and are subject to some general provisions and regulations. For this reason we said above that some parts of the act used the nomenclature of a license law. However, if this is a license to the dealers, it avails them nothing. They cannot do one item of business, until that item has passed scrutiny; hence it is clear that the dominant purpose is not to license and supervise individuals in the following of an occupation or business, but to regulate, to the point of prohibition, the business itself.

Is the act, although affecting interstate commerce, sustainable as an inspection statute, upon the same principle on which food inspection

---

[5] C., B. & Q. R. R. v. McGuire, 219 U. S. 549, 568, 31 Sup. Ct. 259, 55 L. Ed. 328; Chicago, etc., Co. v. Fraley, 228 U. S. 680, 33 Sup. Ct. 715, 57 L. Ed. 1022; Barrett v. Indiana, 229 U. S. 26, 33 Sup. Ct. 692, 57 L. Ed. 1050; U. S. Fidelity & Guaranty Co. v. Kentucky, 231 U. S. 394, 34 Sup. Ct. 122, 58 L. Ed. ——.

laws have been held valid? This question may be answered by considering the case of Savage v. Jones, 225 U. S. 501, 525, 32 Sup. Ct. 715, 56 L. Ed. 1182, in which many of the decisons are collated. The Indiana act required certain food products offered for sale to display a statement of their ingredients. This was thought to be a provision wholly appropriate to the protection of the purchasing public, and not to go beyond the reasonable occasion for such protection, and was said to be "appropriate means for accomplishing the legitimate purpose of the act." To the argument that the statute permitted the officials to set up arbitrary standards, the court replied, "That it does not appear that any arbitrary standard has been set up." In the present case, the statute itself sets up the arbitrary standard, viz., the Commission's opinion as to the probability of loss. If the Indiana statute had provided that the food product should not be sold in the state, if the state chemist concluded that in all probability it was not of much nutritive value, the case would be parallel. An examination of numerous other cases cited indicates that in each one, where a regulation somewhat affecting interstate commerce has been sustained, it has been found that the regulation and prohibition involved had immediate and direct relation to the legitimate object of the statute, and so were within the police power.

We rest our conclusion here on the proposition that this statute, in the respects which we have pointed out, finds no support in the police power, and accordingly that its restraint of interstate commerce is not merely indirect or incidental.

Another reason, if it were necessary, for holding that the restraint upon this interstate commerce is direct is found in the fact, already discussed, that for 30 days there is an absolute prohibition of any dealings on any terms. When we observe that a nonresident, owning stocks or bonds of the highest quality and upon which no criticism has been or can be made, and who desires to sell them in Michigan to some one who there desires to buy, is totally forbidden to do so for a period of 30 days on penalty of being guilty of a felony, and that there is no machinery of the law by which he can get permission or approval until the thirty-first day, it is clear enough that the restraint is substantial and direct.

4. *Does the act delegate legislative or judicial power?*

[3] So far as this objection is directed against the creation of an administrative board supervising business affected with a public interest, it is, of course, untenable. So far as it is directed to the power of the Commission to determine the value of the securities and their fraudulent character, it is, in part, covered by what we have said. Whether the right to determine finally what is and what is not fraudulent, and under a statute which creates no standards, can be vested nowhere save in a court, we will not now consider. So, with the questions whether the failure to provide for notice and hearing is a fatal defect, and whether it is necessary, considering all the provisions of the act, that there should be some judicial review beyond a mere writ of certiorari, under which the Commission's improvident finding of fact would be unassailable.

*5. Is the title of the act sufficient?*

It is doubtful whether one reading the title of the act would suppose that it prohibited the sale of securities which were not fraudulent but merely not worth the selling price; but the broad language of the title is capable of a construction which will cover all the provisions of the act, and, in advance of any decision by the Supreme Court of the state, we should hesitate to make a conclusion of general invalidity depend upon this ground.

[9] 6. There remains only one question. We have found that the power given to the Commissioners to forbid the sale of securities at less than what they think the proper price is a taking of property and is not within the police power, and that the act directly and substantially burdens interstate commerce. Can it be said that these features can be eliminated and still that the law generally may stand? This question is put in concrete form by section 24 of the act, which is:

"Sec. 24. Should the courts of this state declare any section or provision of this act unconstitutional or unauthorized, or in conflict with any other section or provision of this act, then such decision shall affect only the section or provision so declared to be unconstitutional or unauthorized and shall not affect any other section or part of this act."

While this provision in terms refers only to the state courts, such limitation may well be overlooked, for we think the whole section is only declaratory of the existing and well-settled judicial rule. It has long been established that the presence, in an act, of an unconstitutional section or provision would not make the whole act invalid if that part could be cut out and leave a workable act which it might be presumed the Legislature would have passed. We cannot see that section 24 has any force beyond this, except, perhaps, to accentuate the existing presumption that the Legislature would have adopted the remaining, primarily valid, portion of this act. It cannot be that, if the unconstitutional portions are so interwoven with the whole purpose and operation of the statute that they are not fairly separable, the act may nevertheless be enforced in a form in which it was not passed and in which it might not be recognized by its framers. The provisions that the Commission shall pass on the probability of loss (as distinct from fraud) and on the "fairness" of the plan form an integral part of each section creating the Commission's powers. They are bound to modify and characterize the Commission's whole action. It is not improbable that these provisions were inserted in the belief that without them the statute would be practically unworkable. They form an inherent part of the unitary statutory scheme to save citizens from probable financial loss. Certainly the difference between a fraudulent enterprise and an unprofitable one is vital. The criterion of "probable loss" is broader and more inclusive than the criterion of "fraud"; it is not consistent to destroy the inclusive and preserve the included. We cannot, even with the aid of section 24, presume that the law would have been passed if it had prohibited only fraudulent transactions.

So, too, the direct restraint on interstate commerce is an inherent part of many different sections. To enforce the law against the citi-

zens of Michigan and not enforce it against nonresidents would doubtless be a result most surprising to the Legislature.   It is an essential part of the scheme of the law that all persons, residents, and nonresidents shall be prohibited from selling, in Michigan, securities which will probably result in loss to the purchaser; and the excission of this feature leaves the law without vitality.

Further, after the 30-day provision is eliminated, nothing operative remains.

Another branch of what we have called the only remaining question is this:   May all the statutory restrictions be enforced against corporations, foreign or domestic, upon the principle that the state may attach any conditions to what it creates or voluntarily permits? [6] This act does not purport to regulate corporations.   There are no separate sections relating to corporations, which can be preserved and enforced.   Particularly as relates to dealers, every restriction is carefully applied to corporations and partnerships and individuals.   If only corporate dealers were affected, the statute would be evaded so easily as to make it worthless.   It is clear to us that, if we undertook to preserve this act to affect corporations only, we would be making a law in violation of the legislative intent.

Furthermore, as regards foreign corporate dealers, like two of the present plaintiffs, whose business constitutes partly, if not mainly, interstate commerce, the act, to be sustained, must be separable with reference to their interstate and intrastate transactions; and this is upon the well-established principle that states have no power to prohibit or to fetter by conditions the right of corporations to carry on interstate trade in legitimate articles of commerce.   International Text-Book Co. v. Pigg, 217 U. S. 91, 30 Sup. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103.

We are aware that in the Berea College Case, 211 U. S. 45, 29 Sup. Ct. 33, 53 L. Ed. 81, the Supreme Court enforced against a corporation a statute which was drawn to apply to corporations and individuals, and did so without deciding whether individuals must submit; but this may well have been upon the theory that the particular statute justified a presumption that it would have been passed as to corporations alone.   It did not appear that there was any person within the state to be affected by the law at the time it passed, except the corporation which complained.   There can be no such presumption where it was known that the law would affect partnerships and individuals in great number, and where equality of treatment between corporations and individuals was clearly intended.   Further, in the Berea College Case, the state court had decided that the statute was to be construed as if it had been amendatory of the college charter, and that construction of the statute was controlling.

The preliminary injunction must be granted.   The District Judge for the Eastern District of Michigan will settle the terms of the order and will allow an appeal, if one is desired.   The court, as now constituted, has no jurisdiction beyond the motion for injunction.

[6] This is a moot question, as to two of the consolidated cases.