DE HOOP *v.* PENINSULAR LIFE INSURANCE CO.

1. SALES—STOCK—CORPORATIONS—AGENCY.

Evidence, in a suit for the amount paid upon a sale or subscription of corporate stock which was converted to the use of the defendant's agent, who solicited the subscription, defendant refusing to issue the stock or refund the payment, and claiming that before the stock was subscribed for it withdrew the same from the market, that the

agent's authority terminated with the taking effect of the "blue sky law," and that the plaintiff was estopped by delay in presenting the certificate, *held*, to present an issue for the jury whether the letter terminating the agent's authority was ever delivered, and as to the estoppel charged.

2. SAME—ESTOPPEL—RATIFICATION—SALE OF STOCK.
   The trial court did not err in declining to direct a verdict for the defendant on the ground that the so-called "blue sky law," Act No. 143, Pub. Acts 1913, required the agent to register, and he failed to comply with it, since he was a *de facto* agent and the sale was not unlawful as to a corporation which had accepted the benefits of the transaction; especially in view of the cases holding the act of 1913 unconstitutional.

Error to Ottawa; Brown, J., presiding. Submitted June 23, 1916. (Docket No. 112.) Decided September 27, 1916.

Assumpsit by George De Hoop against the Peninsular Life Insurance Company for the recovery of money paid for stock in defendant corporation which was never delivered to plaintiff. Judgment for plaintiff. Defendant brings error. Affirmed.

*Walters & Hicks*, for appellant.

*Louis H. Osterhous*, for appellee.

STEERE, J. Plaintiff recovered a verdict and judgment against defendant in the circuit court of Ottawa county for $750 (with interest), being the amount which he had paid on January 22, 1914, to F. E. Brown, a former stock salesman and insurance solicitor of defendant, for ten shares of its capital stock.

Plaintiff was a farmer living in the township of Zeeland, in said county, where Brown called and first solicited him to buy some stock in the Peninsular Life Insurance Company, defendant, during the summer of

1913. Brown then was, and had been since January, 1909, agent of defendant, authorized to sell its stock. Plaintiff did not then yield to the solicitation, but was apparently a promising prospect, and Brown's efforts were ultimately successful, the deal for the shares of stock at $75 per share being finally consummated on the date stated, at which time plaintiff paid the $750 to Brown, by check, signing one of defendant's forms of application for stock with which Brown was supplied, a duplicate of which was given him by Brown, signed by himself as agent. The check given in payment, drawn on the Zeeland State Bank, was later cashed by Brown and charged up to plaintiff.

Brown had sold 10 shares of defendant's stock to an acquaintance of plaintiff named Haitsema, living in the same township, having first solicited him in March, 1912, but finally closed the deal with him in December, 1913, giving him a countersigned duplicate of his application, as he did to plaintiff, telling him it would be some months before the stock could be issued, but the application was just as good as the certificate of stock, as he could hold it a year and then get his money back with six per cent. if he wished to, requesting him to so advise plaintiff, which was done. Brown subsequently became a defaulter and absconded.

Defendant thereafter refused to recognize the transaction, either by issuing the stock or refunding the money plaintiff had paid Brown for it, denying that Brown was then its agent, and this action was brought to recover the amount so paid.

Plaintiff declared upon the common counts in assumpsit, with an added count outlining the circumstances of his purchase of the stock, including his demands and defendant's refusal.

Defendant pleaded the general issue with special notice that when the so-called blue sky law of 1913

went into effect, on September 10th of that year, defendant withdrew its treasury stock from sale, "and thereafter did not at any time authorize any dealer, and especially F. E. Brown, to sell or offer for sale any of its said treasury stock, or to receive or accept subscriptions therefor from the said plaintiff or any other person," etc., and as a further matter of defense, without waiving the preceding, that plaintiff did not in any manner notify defendant he had paid or applied for any of its stock until January 15, 1915, prior to which time "said F. E. Brown had ceased to be an employee of defendant company for any purpose whatsoever, and had become a fugitive from justice, and this defendant after diligent inquiry and investigation, has been unable to ascertain his whereabouts." By reason whereof it is asserted plaintiff became estopped from maintaining this action.

Upon the trial it was shown conclusively by admissions of defendant's president and its records that Brown was in defendant's employ as its authorized agent, with power to sell its stock, from January, 1909, until some time in October, 1913, and from February 22, 1914, to about January 4, 1915, when he absconded, but it is claimed that on account of the blue sky law going into effect at about that time his authority was revoked, in October, 1913, by a letter from the president telling him to sell no more stock until further notice, and he was not authorized to again act as its agent until some time after the sale in question was made.

Under the contention that a verdict should have been directed in its favor, defendant's counsel only pointed out in their brief assignments of error 3 and 4 as those urged and relied upon, which involve the two questions:

"*First.* Was Brown the agent of the defendant for the purpose of selling stock, at any time between ap-

proximately the middle of October, 1913, and approximately the 20th of February, 1914?

"*Second.* Was the agency of Brown terminated, as a matter of law, by the going into effect, on or about the 10th day of September, A. D. 1913, of Act 143 of the Public Acts of Michigan of 1913—the Blue Sky Law, so called?"

From the undisputed evidence in this case it appears that the Peninsular Life Insurance Company, defendant, was planned, promoted, and organized by John C. Robinson, who became its president and general manager. He testified that after several years' experience as agent selling insurance for various companies he conceived the idea of himself forming an insurance company, and this company was the result. He organized it in 1908 with an authorized capital of $150,000, divided into 3,000 shares with a par valuation of $50 each. At the first meeting of the organizers he got together 13 members, including himself, 40 or 50 shares of stock then having been subscribed for, and he was authorized to sell the remainder of the stock under some contract arrangement with the company, or its members. As it was necessary to deposit $100,000 in cash or bonds with the State insurance department before the company could engage in the business for which it was organized, Robinson's efforts were first directed to selling sufficient stock to raise that amount, which took towards three years, but was finally accomplished, when the company qualified and was licensed to engage in the business of writing insurance some time during April, 1911. In January, 1909, Robinson employed Brown, whom he had previously known as engaged in the life insurance business, to sell stock for the company. From that time until he took his permanent vacation in January, 1915, about six years later, Brown was steadily in defendant's employ, with headquarters in

Grand Rapids, working that territory as its agent, authorized to sell its stock and solicit insurance for it, one or both, without possible question except as to the interim "between approximately the middle of October, 1913, and approximately the 20th of February, 1914," during which time it is claimed his authority to sell stock was suspended.

The matter of Brown's delinquencies was apparently carried beyond his power to cover them, and resulted in his absconding when plaintiff and Haitsema endeavored to secure their stock or return of their money, at the end of the year after they had paid, through their local bank. Robinson then visited Grand Rapids and Zeeland, trying to find Brown, and while there interviewed them. They both testify that he then told them Brown had authority to sell the company's stock up to May 14th, and Haitsema testified Robinson explained that the stock was then taken away from him because the company was doing a good business and the stock would sell itself. This Robinson does not deny, but stated that he did not remember so telling them. He testified:

"Our talk principally was the fact that they bought the stock a long time before, and I knew nothing at all about it until they wrote that week, and what could be done I could not tell them about it. *    *    *

"*Q.* Then your complaint to them was that you had never received the money or the application from Brown, and that they had delayed for a long time in advising the company of the fact of their purchase?

"*A.* Yes.

"*Q.* And there is nothing further that you said to them in regard to it that you remember?

"*A.* No; not that I remember."

He apparently at that time was urging that they were guilty of laches, which later took form in defendant's plea of estoppel, and which manifestly is not a tenable issue under the facts in this case. If

Brown was not defendant's agent at the time he sold
this stock no question of estoppel is involved, and if
he was its agent with authority to make the sale,
plaintiff had performed on his part, and defendant
had not. Within the statute of limitations no estoppel
could arise in its favor by reason of it having de-
faulted in its obligations. Defendant's counsel do not
now so contend, and the only significance of that part
of the interview is that, if Brown was not defendant's
agent when he sold the stock, its president, when talk-
ing to those men about the agency, apparently never
thought of that. He was the man who best knew and
would naturally have the facts within the field of
consciousness; for under a contract with defendant of
April 10, 1911, authorized by its directors, running
for 12 years, he was engaged as its general manager
with "general supervision and direction of all the af-
fairs of said company, subject to the direction of the
executive committee, to act as director of agencies of
said company, with power to employ such managers
of agents and such other agents as he shall deem best,
and to remove them at will."

Robinson, however, testified that while in the Battle
Creek Sanitorium as a patient in the fall of 1913 he
was advised by defendant's secretary, Englehart, that
application had been made by defendant to the State
securities commission in compliance with the then
coming into effect blue sky law, and the necessities in
that connection, following which he wrote, while lying
in bed, a letter to Brown, some time between Septem-
ber 29th and October 13th, telling him not to sell any
more stock until further orders from the writer. No
copy of this letter was kept, and the original could
not be produced. He therefore was permitted to give
oral testimony as to having written it and its contents.

At a meeting of the directors on January 27, 1914,
in a discussion touching proposed sales of the com-

pany's stock, Robinson stated that Brown had sold about 80 per cent. of all stock sold up to that time, and he thought him capable of disposing of the balance on the basis of a 10 per cent. commission. He then had in his possession and exhibited to the board applications for stock recently received from Brown, amongst which was one taken on the same date as that of plaintiff, and one on the day following, for both of which stock was issued. Englehart, the secretary, who served as such from August, 1913, to April, 1914, testified that the company had in its treasury about 777 shares of unsold stock, and up to about January or February, 1914, was desirous of selling stock, the disposition of which was entirely in Robinson's hands; that Brown was defendant's agent, selling stock and writing insurance, and witness did not know of his authority to sell stock being cut off, the general conversation and understanding being that after a license had been secured under the blue sky law from the State securities commission Brown, to whom no license was directly issued as selling agent, would have the selling of stock in Robinson's name.

Without further detailing what witnesses testify to and defendant's records show, we are well satisfied from this record, taken as a whole, that there was ample testimony to carry the question of Brown's agency during the time in question to the jury, and to clearly raise an issue of fact as to whether the claimed letter from Battle Creek, if written, was ever received by Brown. Aside from Robinson's oral testimony to the contrary, the evidence, both oral and written, is persuasive that for several years, including the time in question, Brown was defendant's well-known and recognized agent, authorized to sell its stock and solicit insurance for it, equipped with its blanks and forms of application for purchase, which were never recalled, and within the scope of such agency authorized to act

for and bind his principal. The trial court under a fair and well-guarded charge submitted the single question of Brown's agency, or authority to act, to the jury.

It is further urged, however, that, irrespective of what issues it might otherwise be permissible to submit to the jury, the court should have directed a verdict for defendant because it appeared without dispute that Brown was never licensed by the securities commission to sell stock, and his agency terminated by operation of law on taking effect of the blue sky law on September 10, 1913, which prohibited defendant from selling or offering its stock for sale until 30 days after it had filed the necessary documents required by the act, and required all its authorized agents to be licensed and registered with the commission, citing ample authority upon the unquestioned proposition that an agency may be, and usually is, terminated "by a change of the law which would render performance of the contract illegal."

The blue sky law of 1913 had a comparatively short and somewhat checkered career, having been held unconstitutional by the United States District Court (*Alabama, etc., Transportation Co.* v. *Doyle* [D. C.], 210 Fed. 173), and repealed at the next legislative session (1915), in view of which a case then pending in this court attacking the constitutionality of the act was dismissed, for the reason that the issues there raised had become moot questions. *Howe* v. *Doyle*, 187 Mich. 655 (154 N. W. 62).

We are not impressed that the ghost of that act yet walks in aid of those who seek to benefit by their failure to observe it when ostensibly in being, whether constitutional or not. Under that act, defendant had filed its application with the State securities commission, on September 18, 1913, which was approved and a license to sell stock issued on October 15, 1913.

Robinson returned from Battle Creek during October, and made a trip to the upper peninsula to sell stock and work up business for the company. It was not illegal under that act for defendant to sell its stock nor for plaintiff to buy. The act in one section required investment companies to register their agents, and in another provided agents should not act as such until their names and addresses are registered. This defendant failed to do as to Brown, on the theory, as its secretary testified, that Brown "would have the selling of the stock in Mr. Robinson's name," but if, as the jury found, he did in fact, act in the matter as defendant's representative, authorized and recognized by it to act as such, he was, as between the parties directly interested, its *de facto* agent, dealing for defendant with an innocent party. It was lawful for defendant to sell its stock, and certainly for plaintiff, who knew of no irregularities on defendant's part in making the sale, to buy it.

This action, however, is not for the stock, but for money had and received for defendant by its authorized representative. We think the principle which should be applied to that question in this case is well settled in *People* v. *Hawkins*, 106 Mich. 479 (64 N. W. 736), a criminal case where, in defense of a charge of embezzling money collected by him as agent, Hawkins contended that the corporation for which he collected the money was doing business in this State illegally by reason of noncompliance with statutory requirements relative to foreign corporations, and therefore all contracts made by it were void. Speaking through Justice HOOKER, this court there said:

"But, if it should be held that the act under consideration was prohibitive, and that the company could not make or enforce contracts, it would not follow that this defendant could not be guilty of embezzlement. In fact, he was the agent of the company,

whether it was a lawful enterprise or engagement or not. By virtue of his relation, he became possessed of property which was not his, and which belonged to the company if to anybody. He acted for, and permitted himself to be held out as the agent of, the company, and received money from various persons who were willing to pay. He was a *de facto* servant, and it is unnecessary that his relation should have grown out of a lawful   *   *   *   agency. It was enough if he acted, and was permitted to act, as such."

Merely private interests are involved here. No rule of public policy suggests that the courts should by any narrow or technical construction find this undertaking illegal as a defense to an action to recover moneys from the party by whom, through its *de facto* agent, they were received, and we think the court properly submitted to the jury as a question of fact whether or not they were so received.

The judgment is affirmed.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, BROOKE, and PERSON, JJ., concurred.