WILLIAM R. COMPTON CO. et al. v. ALLEN et al. (NICKERSON et al., Interveners).

(District Court, S. D. Iowa, Central Division. July 6, 1914.)

No. 13A.

1. COMMERCE (§ 40*) — SUBJECTS OF INTERSTATE COMMERCE — STOCKS AND BONDS.

Stocks, bonds, and securities are subjects of interstate commerce, and shipments and sales of the same between the states are interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 29, 30; Dec. Dig. § 40.*]

2. COMMERCE (§ 60*)—CONSTITUTIONAL LAW (§ 207*)—STATE REGULATION OF SALES OF STOCKS AND BONDS — CONSTITUTIONALITY — INTERSTATE COMMERCE.

Acts 35th Gen. Assem. Iowa, c. 137, commonly termed the "Blue Sky Law," which by its terms prohibits a citizen of a sister state owning and having stocks, bonds, certificates, or securities, although the same are listed on the exchanges of the country and have a well-established actual

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and salable value, from either bringing or sending them into the state for sale or negotiating for their sale to any person in the state unless he complies with the requirements of the act by obtaining from the Secretary of State and paying for a certificate as an investment company or a stockbroker and subjecting himself to its penalties, *held*, on an application for a preliminary injunction to restrain its enforcement, not within the police powers of the state as an inspection law, but unconstitutional and invalid ·as imposing a direct burden on interstate commerce, and as imposing burdens upon and denying privileges to citizens of other states which are not imposed upon, and which are granted to, citizens of Iowa.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 91–95; Dec. Dig. § 60;* Constitutional Law, Cent. Dig. §§ 625-648; Dec. Dig. § 207.*]

3. STATUTES (§ 184*)—CONSTRUCTION AND VALIDITY—POWER OF STATE TO ENACT.

The power of a state to enact a law must be determined from that which is sought thereby to be ordained or accomplished, and not from the title it bears.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 262; Dec. Dig. § 184.*]

In Equity. Suit by the William R. Compton Company, Breed, Elliott & Harrison, and McCoy & Co. against W. S. Allen, Secretary of State, and George Cosson, Attorney General of Iowa, with John Nickerson, Jr., and Leach & Co. as interveners. On motion for preliminary injunction. Motion granted.

Caldwell, Masslich & Reed, of New York City, Mayer, Meyer, Austrian & Platt, and Charles L. Powell, all of Chicago, Ill., and Clark, Byers & Hutchinson, of Des Moines, Iowa, for complainants and interveners.

George Cosson, Atty. Gen., of Des Moines, Iowa, for respondent.

Before SMITH, Circuit Judge, and McPHERSON and POLLOCK, District Judges.

PER CURIAM. This suit is brought by plaintiffs, corporate citizens, respectively, of the states of Missouri, Indiana, and Maine, against defendants, respectively, the Secretary of State and the Attorney General of the state of Iowa, to restrain the enforcement of an act of the General Assembly of that state, approved April 19, 1913 (Acts 35th Gen. Assem. c. 137), commonly termed the "Blue Sky Law," of that state, which provides as follows:

"An act to provide for the regulation and supervision of investment companies, and providing penalties for the violation thereof. [Additional to chapter one (1) title nine (ix) of the Code relating to corporations for pecuniary profit.]

"Be it enacted by the General Assembly of the state of Iowa:

"Section 1. Sale of Certain Stocks and Bonds Prohibited—Permits Granted by Secretary of State. That it shall be unlawful for any investment company or stockbroker or any representative thereof, either directly or indirectly, to sell or cause to be sold, offer for sale, take subscription for or negotiate for the sale in any manner whatsoever in this state, except as hereinafter provided, of any stocks, bonds or other securities of any kind or character, other than those expressly exempted from the provisions hereof, without a permit of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the Secretary of State as hereinafter provided. But nothing in this act shall be construed to prohibit the sale of bonds of the United States, or of the state of Iowa, or of municipal, county, school or drainage bonds, or of certificates issued by authority of the laws of the state of Iowa, or to prohibit banks from dealing in the various classes of securities now or hereafter authorized by law or to prohibit the sale of stocks, bonds or other securities at judicial sale or by administrators or executors, or bonds or notes secured by mortgage on real estate, provided that the amount of such lien and of all superior liens upon said real estate shall not exceed three-fourths of the actual cash value thereof.

"Sec. 2. Permits—How Obtained—Information—Documents—Fee. That before any investment company shall secure such permit, it shall be necessary for each and every such investment company to file in the office of Secretary of State, together with a filing fee of ten dollars ($10.), the following papers, documents, etc., together with such other information and documents as said Secretary of State shall deem necessary in each case to wit:

"1. A copy of its Constitution and by-laws, or articles of copartnership or association.

"2. An itemized statement of its actual financial condition and the amount of its properties and liabilities.

"3. A statement showing in full detail the plan upon which it proposes to transact business.

"4. A copy of all contracts, bonds or other securities which it proposes to make with or sell to its contributors.

"5. Sample copies of all literature or advertising matter used or to be used by such investment company.

"6. If it shall be a foreign investment company, it shall file a copy of its charter which copy shall bear the certificate of the Secretary of State, or other state officer having custody of such records, that it is a true, complete and correct copy.

"All the above described papers shall be verified by the oath of a duly authorized member of a copartnership or association, if it be a copartnership or association, and by the oath of the president and secretary, if it be incorporated, provided that the Secretary of State shall have the power to require such officers to make affidavit to such other reports or information as he may call for.

"Sec. 3. Foreign Corporation—Service of Notice on Secretary of State. Every foreign investment company shall, before receiving a certificate as provided in section four (4) hereof, file in the office of the Secretary of State an agreement in writing (authenticated by the seal of said foreign investment company and by the signature of a member of a copartnership or company if it be a copartnership or company, or by the signatures of the president and secretary of the incorporated or unincorporated association, and shall be accompanied by a duly certified copy of the order or resolution of the board of directors, trustees or managers of the corporation, authorizing the said president and secretary to execute the same), that thereafter service of notice of any action or process of any kind against such foreign investment company, growing out of the transaction of any business of said company in this state, may be made on the Secretary of State, and when so made, such service of notice or process of any kind shall be valid, binding and effective for all purposes as if served upon the foreign investment company according to the laws of this or any other state, and waiving all claims or right of error by reason of such acknowledgment of service. Such notice or process with a copy thereof, may be mailed to the Secretary of State at Des Moines, Iowa, in a registered letter addressed to him by his official title, and he shall immediately upon its receipt acknowledge service thereof on behalf of the defendant foreign investment company by writing thereon, giving the date thereof, and shall immediately return such notice or process in a registered letter to the clerk of the court in which the suit is pending, addressed to him by his official title, and shall also forthwith mail such copy, with a copy of his acknowledgment of service written thereon, in a registered letter addressed to the person or corporation who shall be named or designated as such foreign investment company in such written instrument.

"The above provisions for the service of notice or process of any kind are merely additions to the general provisions of law relating to the service of notice or process, and are not to be construed to be exclusive.

"Sec. 4. Statement Filed—Examination—Permit. It shall be the duty of the Secretary of State to examine the statements and documents so filed and if he shall deem it advisable, he shall require such investment company to furnish him with further and more detailed information regarding the affairs of such investment company, and if he finds that such investment company is solvent; that its articles of incorporation or association, its constitution and by-laws, its proposed plan of business, and proposed contracts contain and provide for a fair, just and equitable plan for the transaction of business, he shall issue to such investment company a statement reciting that such company has complied with the provisions of this act and that such investment company is permitted to do business in this state. In no case shall the Secretary of State issue to such investment company or to its stockbrokers or agent thereof a permit to do business in this state unless, in his judgment, said investment company meets the requirements of this act.

"Sec. 5. Amendment of Charter, Articles of Incorporation, Constitution or By-laws Filed with Secretary of State. That no amendment of the charter, articles of incorporation, constitution or by-laws of any such investment company shall become operative until a copy of the same has been filed with the Secretary of State as provided in regard to the original filing of such papers, nor shall it be lawful for any such investment company to transact business on any other plan than that set forth in the statement required to be filed in section two (2) of this act, or to make any contract other than that shown in the copy of the proposed contract required to be filed by the provisions of said section, until a written statement showing in full detail the proposed new plan of transacting business and a copy of the proposed new contract shall have been filed with the Secretary of State in like manner as provided in regard to the original plan of business and proposed contract, and the consent of the Secretary of State obtained as to making such proposed new plan of transacting business and proposed new contract.

"Sec. 6. Certified Financial Statement—Fee—Failure to Report—Forfeit. That at the close of business of December 31st of each year, and at such other times as the Secretary of State may require, every investment company, domestic and foreign, shall file with the Secretary of State a statement properly verified by the officers of said company, which statement shall set forth its financial condition and the amount of its assets and liabilities and such other information concerning its financial affairs as the Secretary of State may require; said statement being for the information of the Secretary of State, and it shall not be open to public inspection, neither shall it be published, or used for private purposes. Each annual statement shall be accompanied by a filing fee of two dollars ($2.00). Any investment company failing to file said statement for the preceding year by the first day of February of each year, or failing to file any other or special report herein required within thirty (30) days after receipt of request therefor, shall forfeit to the state of Iowa the sum of five dollars ($5.00) per day until said statement is filed, or until its right to do business in this state is canceled; and unless said reports are filed within thirty (30) days from the time they are due the Secretary of State may cancel the right of said company to do business in this state.

"Sec. 7. General Accounts—How Kept—Open to Inspection. The general accounts of every such investment company, domestic or foreign, shall be kept in a businesslike and intelligent manner and in sufficient detail that the Secretary of State can ascertain at any time its financial condition; and such books of account shall at all times during business hours, except on Sundays and legal holidays, be open to stockholders and investors in said companies and to the Secretary of State or his duly authorized representatives.

"Sec. 8. General Supervision—Secretary of State—Powers—Examination Fee—Examiner's Expenses—Permit Canceled. The Secretary of State shall have general supervision and control as provided by this act over any and all investment companies, domestic and foreign, doing business in this state and not expressly exempted, and all such investment companies shall be subject

to examination by the Secretary of State or his duly authorized representative at any time the said Secretary of State may deem it necessary. The right, powers and privileges of the Secretary of State in connection with such examination shall be the same as is now provided with reference to examination of state banks; and such investment companies shall pay a fee for each of such examinations of not to exceed six dollars ($6.00) for each day or fraction thereof spent by the said Secretary of State or his duly authorized representative while absent from the capitol in making such examination, and also the actual traveling and hotel expenses of said examiner, and upon failure or refusal of any such investment company to pay such fees upon the demand of the Secretary of State, or his duly authorized representative, the Secretary of State may cancel its right to do business in this state until such fee is paid.

"Sec. 9. Assets Impaired—Permit Canceled. Whenever it shall appear to the Secretary of State that the assets of any investment company doing business in this state are impaired to the extent that such assets do not equal its liabilities or that it is conducting its business in an unsafe, unfair, inequitable or unauthorized manner, or is jeopardizing the interests of its stockholders or investors in stocks, bonds or other securities by it offered for sale in this state, or whenever any investment company shall fail or refuse for a period of thirty days to file any papers, statements or documents required by this act without giving reasons therefor satisfactory to the Secretary of State, he shall at once cancel the right of said investment company to continue to do business in this state.

"Sec. 10. False Statements—Fraudulent Advertisements—Penalty. Any investment company or person who shall knowingly and willfully subscribe to or cause to be made any false statement or false entry in any book of such investment company, or exhibit any false paper with the intention of deceiving any person authorized to examine the affairs of such investment company, or shall knowingly or willfully make or publish any false statement of the financial condition of such investment company, or the stocks, bonds or other securities by it offered for sale shall be deemed guilty of a felony; and upon the conviction of any such investment company of such felony it shall be fined not less than one hundred dollars ($100.) nor more than ten thousand dollars ($10,000.), and the Secretary of State may forthwith cancel the right of said investment company to transact business in this state; and upon the conviction of a person of such felony he shall be fined not less than one hundred dollars ($100.) nor more than ten thousand dollars ($10.000.), and he may be imprisoned for not more than ten years, or by both such fine and imprisonment in the discretion of the court.

"Sec. 11. Persons Failing to Comply—Penalty. Any stockbroker, agent or other person, unless expressly exempted from the provisions of this act, who shall sell or attempt to sell the stocks, bonds or other securities of any investment company (domestic or foreign), which has not complied with the provisions of this act, or whose permit has been canceled under the provisions of this act or who shall do or attempt to do business for any such investment company, which has not complied with the provisions of this act, or who shall upon demand refuse to exhibit his duly registered certificate of registration received from the Secretary of State, or who shall violate any of the other provisions of this act, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined for each of such offenses not less than one hundred dollars ($100.) nor more than five thousand dollars ($5000.), or by imprisonment in the county jail of not more than ninety (90) days, or by both such fine and imprisonment in the discretion of the court.

"Sec. 12. Collection of Fees—Record of Receipts and Expenditures—Clerks, Deputies—How Appointed—Salaries—How Paid. All fees herein provided for shall be collected by the Secretary of State and by him turned into the state treasurer on the first secular day of each month; and the Secretary of State shall keep a record of the receipts and expenditures incurred in carrying out the provisions of this act. The Secretary of State is hereby authorized to appoint such clerks and deputies as the executive council deem actually necessary to carry this act into full force, and effect; but none of whom shall be related by blood or marriage to such Secretary of State. The compensation of

such clerks and deputies shall be fixed by the executive council. Before the salary and expenses of any such clerk or deputy shall be paid, a detailed and itemized statement of account shall be prepared by such claimant and duly verified, which verification shall aver that such claim is just, reasonable and wholly unpaid and that the amount therein stated has been expended by such claimant. When said claim has been approved by the Secretary of State and audited and allowed by the executive council, it shall be paid by a warrant drawn by the auditor of state upon the state treasurer, and there is hereby appropriated out of any money of the state treasury, and not otherwise appropriated, an amount sufficient to meet said salaries and expenses.

"Sec. 13. Appeal from Decision of Secretary of State—Time—How Made. Any investment company, domestic or foreign, or any stockbroker, which shall be denied a certificate to transact its business in this state or whose certificate shall be revoked by the Secretary of State in pursuance of this act, or any interested citizen of this state, shall have the right to appeal to the executive council of this state from any decision of the Secretary of State relating to the provisions of this act, within twenty (20) days from the entry of such decision by serving notice of such appeal upon the secretary of the executive council, and such appeal shall be heard and determined by the executive council under such rules and regulations as they may prescribe.

"Sec. 14. Agents—When—How Appointed—Expiration and Revocation of Permit—Fee—Standard Securities. Any investment company which has complied with the provisions of this act and received from the Secretary of State a certificate authorizing it to offer its securities for sale in this state may appoint one or more stockbrokers or agents to act for it; but no such stockbroker, except under the provisions of the next section, or agent, or any other person, shall directly or indirectly, do any business for said investment company in this state until he shall first register with the Secretary of State and file with such officer his written appointment and authority from said investment company to act as its stockbroker or agent and receive from him a certificate showing that such investment company has complied with the provisions of the law and that such person is authorized to act for it. All such certificates shall be subject to revocation by the Secretary of State, and unless so revoked shall expire on the first day of July each year. A charge of one dollar ($1.00) shall be made by the Secretary of State for each certificate issued to each stockbroker or agent.

"Sec. 15. Stockbroker—Permit—Standard Securities—Lists—Semimonthly Report—Investigation of Stockbroker and Stocks—Expenses—Fee—Bond— Forfeiture. The Secretary of State may issue to any stockbroker who has been a resident of the state during the last preceding six (6) months an annual permit, which permit shall entitle such stockbroker to handle such stocks, bonds or other securities in the state of Iowa as are known to be standard, or are well known to be safe and legitimate investments, or such as are found by investigation of the Secretary of State to be safe and legitimate stocks, bonds or other securities; provided, however, such stockbroker shall file on the first and fifteenth day of each month a detailed list of the stocks, bonds or other securities on hand for sale and also all of those sold by him during the preceding half month and not previously reported; provided further that said Secretary of State shall have authority to prohibit a stockbroker from handling any of such issues at any time or to cancel said stockbroker's permit at any time he decides that said broker is not handling such securities as he deems safe and legitimate investments. But the Secretary of State shall not issue such annual permit to any stockbroker until he has first satisfied himself by special investigation as to the character and responsibility of such stockbroker and as to the character of the class of stocks, bonds and other securities handled by such stockbroker; and also as to his reputation for handling such stocks, bonds and other securities as the Secretary of State shall deem to be safe and legitimate investments. In the event the Secretary of State shall make any investigation provided for under the provisions of this section the expense incurred thereby shall be born (borne) by the stockbroker so investigated. He shall also pay a fee of fifty dollars ($50.) to the Secretary of State for each of said annual permits, which permit, unless sooner revoked by the Secretary of State shall expire on the first secular day of July

of each year. If said permit is issued after the first of January of any year, the fee shall be reduced one-half. Before being granted such permit by the Secretary of State the stockbroker shall give a bond in the penal sun (sum) of five thousand dollars ($5000.) to the state of Iowa, conditioned upon a strict compliance with this act, which bond shall be approved by the executive council and filed with the Secretary of State. Said bond shall be forfeited by a violation of the terms or conditions of this act, or by a conviction for such violation, and the Attorney General of this state may institute suit in the name of the state of Iowa in any court of competent jurisdiction for a forfeiture thereof at any time within two years from the time the cause of action accrues; provided that if it appears such violation was not intentional and no fraud was shown only so much of said bond shall be forfeited which shall be equal to the amount of damages sustained.

"Sec. 16. Bona Fide Owner Resident of State—Disposing of Securities— Registration of Securities—Fee. Nothing in this act shall be so construed as to prohibit the bona fide owner of any stocks, bonds or other securities, who is at the time a resident of this state, from selling, exchanging or otherwise disposing of the same when not made in the course of continuing or repeated transactions of a similar nature, or when the said securities, including negotiable promissory notes, have been issued or given for goods, wares or merchandise purchased or dealt in by the issuer in the ordinary course of his business, or when sold, exchanged or otherwise disposed of to a bank, trust company, insurance company, building and loan association, or to a stockbroker duly authorized to transact business within this state, provided that the same are sold by said owner in good faith and not for the purpose of evading the provisions of this act; and the Secretary of State may authorize in writing any such bona fide owner of any stocks, bonds or other securities to sell in this state any other securities not included in the provisions set forth in the preceding portion of this section; provided, however, that it shall be made to appear to the satisfaction of the Secretary of State that such stocks, bonds or other securities are safe and legitimate investments, and that they were acquired and held by the owner in good faith, and not for the purpose of evading the provisions of this act, and that said owner desires in good faith to dispose of said securities; but before such authorization shall issue the owner of such securities shall register, in a book kept for that purpose by the Secretary of State, the stocks, bonds and other securities desired to be sold, giving the character of the security, the par value thereof, the date of issue, and any other data concerning the same which the Secretary of State may require. A certificate fee of one dollar ($1.00) shall be charged for each such authorization.

"Sec. 17. Permit—Bold Type—Securities Not Recommended by Secretary of State—Advertisement. That each and every certificate or permit granted by the Secretary of State under the provisions of this act to any investment company or to any stockbroker, agent or representative thereof or to any other person, shall have printed across its face in bold type the statement: 'The Secretary of State in no wise recommends the stocks, bonds or other securities offered for sale by this (investment company, stockbroker, agent, representative or person, as the case may be)'; and any investment company or any stockbroker, agent or representative thereof or any person who shall refer to such certificate or permit in any advertisement or printed matter of any kind shall also print in said advertisement or printed matter, with equal prominence, the statement: 'The Secretary of State in no wise recommends the stocks, bonds, or other securities herein referred to.'

"Sec. 18. Terms Defined. In the construction of this act the following definitions shall be followed, unless such construction would be inconsistent with the manifest intent or repugnant to the context of the statute:

"1. That the name 'investment company' as used in this act shall include every corporation or concern, however constituted, now or hereafter organized, which shall sell or cause to be sold or offered for sale, take subscriptions for, or negotiate for the sale of any stocks, bonds or other securities of any kind or character to any person or persons in the state of Iowa. But nothing in this act shall be construed to make the provisions thereof apply to state, savings, private or national banks, loan and trust companies, local building and

loan associations, or to the sale of real estate under bond or contract where the actual transfer of title thereto is contingent upon the future payment or considerations, or corporations not organized for profit.

"2. The name 'domestic' as used in this act shall apply to those corporations or concerns incorporated or organized under the laws of Iowa or having their principal place of business in the state of Iowa; and the word 'foreign' shall apply to those corporations or concerns organized under the laws of another state or having their principal place of business outside the state of Iowa.

"3. The name 'stockbroker' as used in this act shall include every person, set of persons, association, company, copartnership or corporation, who shall deal in stocks, bonds or other securities covered by this act, or who shall sell, offer or negotiate for the sale, in the state of Iowa, of any stocks, bonds or other securities covered by this act, or who shall underwrite or purchase such securities and resell them to any person or persons in the state of Iowa at a commission or profit.

"4. The name 'agent' as used in this act shall include any persons who shall act for any investment company or stockbroker, offering for sale, taking subscriptions for, or negotiating for the sale of, or selling any securities for any investment company or stockbroker, either as an employé on a salary basis or for a commission or who shall execute, issue, sell, offer or negotiate for sale, any contract, bond or other instrument, by the terms of which title to real estate located outside the state of Iowa is to be transferred upon the completion of certain payments or the performance of certain conditions therein specified; provided that if it appears such violation was not intentional and no fraud was shown only so much of said bond shall be forfeited which shall be equal to the amount of damages sustained.

"Sec. 19. Acts in Conflict Repealed. All acts and parts of acts in so far as they are in conflict with this act are hereby repealed.

"Approved April 19, A. D. 1913."

In this suit, by leave of court, John Nickerson, Jr., a natural citizen of the state of Missouri, and A. B. Leach & Co., a copartnership, with its principal place of business in the city of New York, composed of Arthur B. Leach and James B. Campbell, citizens of the state of New York, and Ferry W. Leach and George C. Olmstead, citizens of the state of Illinois, have intervened, praying the same relief. A restraining order was granted by the presiding judge of the court, and, this suit being one in which the injunctive relief sought is the life of the case and against the legislative action of a state, the application for an interlocutory injunction pendente lite was submitted to and stands for decision in accordance with the provisions of section 266 of the Judicial Code. Act March 3, 1911, c. 231, 36 Stat. 1162 (U. S. Comp. St. Supp. 1911, p. 236).

The grounds of attack made against the constitutional validity of the act may be briefly summarized, as is done by defendants, as follows: (a) The act offends against the fourteenth amendment by depriving persons of property without due process, and denies the equal protection of the laws and abridges the privileges and immunities of citizens of the United States; (b) that it offends against the commerce clause of the federal Constitution; (c) that it grants privileges and immunities to citizens of Iowa denied to citizens of other states; (d) that it is a delegation of legislative and judicial power; (e) that the act was not regularly passed.

While courts of justice may not concern themselves with the wisdom or policy of a law the validity of which is challenged on constitutional grounds, such consideration being alone addressed to the

lawmaking power, yet, it may safely be observed in this case, the purpose of the act under consideration as declared by the Attorney General of the state, namely, to protect the humble, honest citizens of the state, unlearned in the intricacy of business affairs as conducted at this day from being plundered and despoiled of their small earnings and property, acquired through years of patient toil, by the alluring machinations and the deceptive, misleading, and fraudulent devices which the unscrupulous, cunning, and deceitful "Get-Rich-Quick-Wallingfords" of our day practice, is a most laudable obligation and important duty of the state. And if this state, in its attempted compliance with such just obligation to its citizenship, be not found, by a careful study and analysis of the act in question and a reasonable and rational comparison of its provisions when ascertained and understood with the organic law of the nation or state, to have clearly and certainly violated some fundamental principle thereof established by the people for their mutual protection from invasion by the lawmaking power, it is the clearly defined and well-recognized duty of this court to uphold the act and allow the people, in the manner authorized by the organic law of the state, to modify or repeal it, if on fair trial it be found vicious or harmful in actual operation.

Viewed in this light, and as the case as now presented arises only on an application for a temporary order restraining the enforcement of the act until final decree on full hearing, many grounds of invalidity are presented which need not be fully considered or ruled. Concerning the power of the state to regulate or control by its laws the operations and dealings of "investment companies," as that term is usually employed and understood, whether such companies are created under the laws of this state, or are created under the laws of foreign states, and make application for the privilege of engaging in business within this state, little of doubt arises and nothing need be said.

Again, as to the manner of the passage of the act of which complaint is made, whether the enrolled bill shall be held as final and conclusive evidence of its contents will not be considered or ruled on this hearing. Such subject-matter is so entirely a matter of state policy and concern in the enactment of its laws, an orderly course of judicial procedure in the administration of justice dictates the wisdom, where possible, as in this case, of leaving that question to the determination of the highest judicial tribunal of the state, which is in the end the final arbiter, untrammeled and untouched by any opinion of this court, for, as we are advised, this identical question is pending therein for decision.

Coming now to a consideration of the act for the purpose of determining whether it does in express terms and undoubted meaning and intent contravene any provision of the organic law of the nation or this state, it is seen to undoubtedly prohibit any person or citizen, natural or corporate, of any foreign state, from selling or offering for sale, in person or through another, in any manner or way whatever, any stocks, bonds, or other securities or obligations, of every kind and nature, to any person within this state, unless the provisions of

216 F.—35

the act are first complied with, under heavy penalties. That is to say, by its express terms the act prohibits a citizen of a sister state of this country, owning and having stocks, bonds, certificates, or securities, although the same are listed on the exchanges of the country and have a well-established actual and salable value, from either bringing or sending the same into this state for sale unless he first meets the exactions of this law, or by so doing subjects himself to its penalties. Nor may he enter upon and conduct negotiations looking to or consummating a sale of his property by correspondence through the mails of the country, either personally or through his agent, without compliance with the provisions of the act or abiding its penalties.

[1] Can it be a state of this Union, under our Constitution, possesses the power to punish the doing of such customary, everyday transactions unless the conditions, exactions, regulations, and restrictions imposed by this law be first met and performed? That the act in express terms and by inclusive definitions employed therein does so ordain cannot be gainsaid or denied. That such is the effect and purpose of the act in controversy was not disputed by the able Attorney General of the state on the argument of this cause. That the transportation of such articles of personal property from one state to another for the purpose of barter, sale, and delivery constitutes not only commerce among the states of this country, but a very large and important element of such commerce in the magnitude of business transacted and the amounts of money involved, is self-evident. The District Court for the Eastern District of Michigan, ruling this identical question in Alabama & N. O. Transp. Co. v. Doyle (D. C.) 210 Fed. 173, said:

"We cannot doubt that stocks and bonds are now the subject of interstate commerce, and that shipments and sales of them, between the states, are interstate commerce. We do not find that this has been expressly held in any authoritative decision, but, in the present development of commerce, it would be regarded as obvious, save for the argument based upon Nathan v. Louisiana, 8 How. 73, 12 L. Ed. 992 (involving foreign bills of exchange), and Paul v. Virginia, 8 Wall. 168, 19 L. Ed. 357 (involving insurance contracts)."

In the Lottery Cases, 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492, it was held by a divided court even lottery tickets, which have no absolute value whatever, either in form or fact, but have merely a contingent, speculative, and gambling value, were held to be the subject of interstate commerce when transported from one state into another. While the soundness of this view was assailed by vigorous dissent on the part of almost one-half the court, yet, as shown by the review of authorities made in the dissenting opinion, no reason is left for doubt but that negotiable securities, corporate shares, promissory notes, corporate and municipal bonds, absolute in form, are the subjects of interstate commerce, and would have been so declared by the members of the court joining in the dissent. In the opinion in that case, Mr. Justice Harlan said:

"What is the import of the word 'commerce' as used in the Constitution? It is not defined by that instrument. Undoubtedly the carrying from one state to another by independent carriers of things or commodities that are ordi-

nary subjects of traffic, and which have in themselves a recognized value in money, constitutes interstate commerce."

Under the many decisions from the Supreme Court since that of Nathan v. Louisiana, supra, holding foreign bills of exchange, and Paul v. Virginia, supra, holding insurance policies, not subjects of interstate commerce, we have no doubt but that court, when presented with the question, will declare such securities and property rights, negotiable and otherwise, as are sought to be regulated by the act in question, are proper subjects of interstate commerce.

[2] That the act in question, in prescribing the only terms and conditions on which complainants and interveners, citizens of foreign states, may transact the business of disposing of their property within the borders of this state, does impose a burden on interstate commerce needs no comment further than a reading of the act itself, for, by the law, it is placed within the power of officers of the state to absolutely prohibit such business transactions. And it would further seem, from the briefs and arguments for defendants in the case, in thus far there is no substantial disagreement with the view taken, for the insistence made by defendants is not that the act in question does not impose a burden on those dealing in securities in this state, but rather that the burden so imposed is of such nature the state may lawfully prescribe it under its reserve powers even on interstate commerce; that is to say, under its police power, to enact inspection or license laws for the purpose of preventing the imposition of fraudulent practices on its citizens. A reading of the act in question will disclose its requirements, exactions, prohibitions, and penalties are leveled against all persons, corporations, and aggregations of individuals, by whatever name or nature known (except a few favored citizens of the state), who, by definitions made a part of the act itself, are gathered into two general classes under the name of "investment companies" and "stockbrokers," and the power to regulate the business of all by definition so classified in their business dealings in stocks, bonds, certificates, securities, etc., within the state, extends even to absolute prohibition thereof, unless compliance with the requirements of the act be made to the satisfaction of officials of the state charged with the enforcement of the law. With the power of the state to so classify by definition all individuals, whether natural or artificial, and all aggregations of individuals by whatever name known, we are not concerned at this time. The question here presented is, Does the power of the state extend to the regulation, control, and prohibition of interstate commerce in such subjects as are involved in this act under its reserved right to inspect for the public good?

[3] While the act is neither in form nor title styled an inspection act, the title thereto being merely, "An act to provide for the regulation and supervision of investment companies and providing penalties for the violation thereof," such fact is thought to be of no great moment, for the power to enact the law must be determined from that which is sought thereby to be ordained or accomplished, and not from the title it bears. Henderson et al. v. Mayor of N. Y. et al.,

92 U. S. 259, 23 L. Ed. 543; Minnesota v. Barber, 136 U. S. 313, 10 Sup. Ct. 862, 34 L. Ed. 855; Standard Stock Food Co. v. Wright, 225 U. S. 540, 32 Sup. Ct. 784, 56 L. Ed. 1197. While under authority of the foregoing cases, and many others, such as Plumley v. Mass., 155 U. S. 462, 15 Sup. Ct. 154, 39 L. Ed. 223; Crossman v. Lurman, 192 U. S. 189, 24 Sup. Ct. 234, 48 L. Ed. 401; McLean v. Denver & Rio Grande R. R. Co., 203 U. S. 38, 27 Sup. Ct. 1, 51 L. Ed. 78; Delamater v. South Dakota, 205 U. S. 93, 27 Sup. Ct. 447, 51 L. Ed. 724, 10 Ann. Cas. 733; and Savage v. Jones, 225 U. S. 501, 32 Sup. Ct. 715, 56 L. Ed. 1182, the power of the state to provide for the inspection of legitimate subjects of interstate commerce moving as such, to charge a reasonable fee therefor, and to even prohibit the importation of such articles, commodities, and products as do not conform to the test applied is undoubted, yet it must be held the scope of such inspection laws is not without its limitation as applied to the nature of the person, article, or thing designed by the law to be inspected and the manner and method of the inspection to be employed. In People v. Compagnie Gen. Transatlantique, 107 U. S. 59, 2 Sup. Ct. 87, 27 L. Ed. 383, the state of New York attempted by legislation to provide for the inspection of immigrants coming from foreign countries into the ports of that state. There was no doubt but that such inspection was reasonably necessary and was promotive of great public good in preventing the spread of both physical ailments and moral diseases. The question presented was the power of the state to provide such inspection by its law. Mr. Justice Miller, delivering the opinion of the court, said:

"In addition to what is said above it is apparent that the object of these New York enactments goes far beyond any correct view of the purposes of inspection law. The commissioners are 'to inspect all persons arriving from any foreign country to ascertain who among them are habitual criminals, or pauper lunatics, idiots, or imbeciles, * * * or orphan persons, without means or capacity to support themselves and subject to become a public charge.' It may safely be said that these are matters incapable of being satisfactorily ascertained by inspection. What is an inspection? Something which can be accomplished by looking at or weighing or measuring the thing to be inspected, or applying to it at once some crucial test. When testimony or evidence is to be taken and examined, it is not inspection in any sense whatever."

Conceding, therefore, to the fullest extent, the reserve power of the state to provide for the inspection of all such articles and commodities as foodstuffs for man or beast, drugs, medicines, products, compounds, and the like, moving in interstate commerce where inspection thereof is not already provided by national laws, and when, as stated by Mr. Justice Miller, some crucial test is established and may be applied, such as weighing, measuring, analyzing, and the like, it is apparent no such standard or test is or can be established under the act in question, but the test to be applied thereunder must and does rest upon evidence taken, examined, and weighed. It must be held the subjects of interstate commerce therein sought to be regulated and controlled are not only burdened by the act, but are directly burdened thereby, and that such articles are not the subject of state inspection laws. As bearing on this question see Alabama

& N. O. Transp. Co. v. Doyle, supra; International Text-Book Co. v. Pigg, 217 U. S. 91, 30 Sup. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103; Crutcher v. Kentucky, 141 U. S. 47, 11 Sup. Ct. 851, 35 L. Ed. 649; Butler Bros. Shoe Co. v. United States Rubber Co., 156 Fed. 1, 84 C. C. A. 167.

Again the citizenship of this country is dual in its nature. We owe allegiance to two sovereigns, our country and our state. In turn we are entitled to that measure of protection which each under its Constitution and laws may afford us. Our national Constitution prohibits any state from granting immunity from punishment and regulation by law to its citizens which it denies to citizens of other states. The mere reading of the act in question makes entirely clear the contention of complainants and interveners that it does impose burdens upon and denies privileges to citizens of other states which are not imposed upon and which are granted to citizens of Iowa. That such favoritism of the law of a state to its citizen subjects as this act grants cannot be successfully defended, no matter how laudable the purpose sought to be accomplished thereby may be thought to be, would appear settled by numerous authoritative decisions. St. L. & San Francisco Railway v. Gill, 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567; Covington & L. Turnpike Road Co. v. Sandford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560; Cotting v. Kansas City Stockyards Co., etc., 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92; Chicago, M. & St. P. Ry. Co. v. Westby, 178 Fed. 619, 102 C. C. A. 65, 47 L. R. A. (N. S.) 97; Butler Bros. Shoe Co. v. United States Rubber Co., supra.

The view taken, as heretofore expressed, renders any lengthy discussion of this important question, or any discussion whatever of other objections made by complainants and interveners to the validity of the act, on this application for a mere temporary order, unnecessary. Such matters can be thoroughly considered and ruled on final decree. Meanwhile the temporary order applied for must be granted, on such terms as to form and bond required to be given, and on such orders as to an appeal, if one shall be prayed, as the presiding judge of this court may be advised are proper.

It is so ordered.