**OKLAHOMA–TEXAS TRUST v. SECURITIES AND EXCHANGE COMMISSION.**

No. 1641.

Circuit Court of Appeals, Tenth Circuit.
Jan. 5, 1939.

Elmer J. Lundy, of Tulsa, Okl. (Rupert F. Bippus, of Chicago, Ill., Poe, Lundy & Morgan, of Tulsa, Okl., and Bippus, Rose, Burt & Pierce, of Chicago, Ill., on the brief), for petitioner.

Lewis M. Dabney, Jr., of Washington, D.C., and O. John Rogge, of Chicago, Ill. (Chester T. Lane, Herbert B. Cohn, and Raoul Berger, all of Washington, D. C., on the brief), for respondent.

Before LEWIS, PHILLIPS, and WILLIAMS, Circuit Judges.

PHILLIPS, Circuit Judge.

On December 7, 1935, the Oklahoma-Texas Trust,[1] an express trust, was organized under the laws of Oklahoma, for the purpose of engaging in the business of acquiring, owning, and operating oil and gas leases. A. J. Diffie, W. E. Brown, H. I. Shanks, and V. H. Van Horn were named as trustees in the declaration of trust. It authorized and directed the trustees to issue 107,000 participating interests or units, to offer such units to the general public at a price of $10 per unit, and to allow a commission or discount of $1.50 per unit to dealers, distributors, or underwriters.

On December 12, 1935, the Trust filed with the Securities and Exchange Commission a registration statement covering the 107,000 units. The statement became effective February 19, 1936, pursuant to Section 8(a) of the Securities Act of 1933, as amended, 15 U.S.C.A. § 77h(a).

The first public offering of the units was made by the issuer on February 24, 1936. On January 30, 1937, approximately 1307 units, being all of the units remaining in the hands of the issuer, were transferred to a dealer. On February 11, 1937, 4318 units remained in the hands of dealers.

On November 18, 1936, the Commission advised the Trust by telegram that a preliminary investigation was being made under Section 8(e) of the Act, 15 U.S.C.A. § 77h(e), to determine whether a stop order should issue under Section 8(d) of the Act, 15 U.S.C.A. § 77h(d). Notwithstanding this notice, the Trust continued to offer its securities to the public. On January 8, 1937, the Commission by telegram notified the Trust of a hearing to be held on February 9, 1937. The hearing was commenced on the latter date. At that time, attorneys for the Trust advised the examiner and the attorneys for the Commission that the entire issue of units had been sold by the issuer. Hearings were completed on February 27, 1937. The examiner filed his report on March 30, 1937.

On April 12, 1937, the Trust filed a motion to dismiss the proceeding, predicated on the ground that the trustees had sold all the units comprising the issue and were no longer using the mails or facilities of interstate commerce in the sale of securities and, therefore, the purposes of the registration statement had been fully served and the Commission had lost jurisdiction to issue a stop order.

On June 11, 1937, the Trust filed its verified application for withdrawal of the registration statement in which it was stated that all the units sold to dealers had been resold by the dealers to investors. The application to withdraw was predicated on

---

[1] Hereafter referred to as the trust.

the ground that it had fully served its purposes in that all the units had been disposed of by the issuer and the dealers and had acquired an exempt status under the provisions of Section 4 of the Securities Act of 1933, as amended, 15 U.S.C.A. § 77d.

On September 23, 1937, the Commission denied the motion to dismiss and the application to withdraw the registration statement, made its findings of fact, and rendered its opinion on the merits. It found that the registration statement was false and misleading in certain particulars and entered a stop order suspending the effectiveness of the registration statement.

The Trust filed this petition to review the Commission's order under Section 9(a) of the Securities Act of 1933, 15 U.S.C.A. § 77i (a).

### I. The Constitutionality of the Act.

The Trust contends that the Securities Act is unconstitutional for the reason that the transportation and sale of securities is not interstate commerce.

In the Lottery Cases, 188 U.S. 321, 345, 23 S.Ct. 321, 322, 47 L.Ed. 492, the Supreme Court said:

"What is the import of the word 'commerce' as used in the Constitution? It is not defined by that instrument. Undoubtedly, the carrying from one state to another by independent carriers of things or commodities that are ordinary subjects of traffic, and which have in themselves a recognized value in money, constitutes interstate commerce."

While securities are mere evidences of obligations to pay money or of rights to participate in earnings and distribution of corporate, trust, and other property and are mere choses in action, nevertheless in modern commercial intercourse they are sold, purchased, delivered, and dealt with the same as tangible commodities and other ordinary articles of commerce. The mails and the facilities of interstate commerce are commonly used to effectuate their sale and transfer and we have no doubt that they should be regarded as subjects of interstate commerce and transportation.[2]

In Electric Bond & Share Co. v. Securities & Exch. Commission, 303 U.S. 419, 442, 58 S.Ct. 678, 686, 82 L.Ed. 936, 115 A. L.R. 105, the court said:

"When Congress lays down a valid rule to govern those engaged in transactions in interstate commerce, Congress may deny to those who violate the rule the right to engage in such transactions. Champion v. Ames, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492; United States v. Delaware & Hudson Co., 213 U.S. 366, 415, 29 S.Ct. 527, 53 L. Ed. 836; Brooks v. United States, 267 U. S. 432, 436, 437, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407; Gooch v. United States, 297 U.S. 124, 56 S.Ct. 395, 80 L.Ed. 522; Kentucky Whip & Collar Co. v. Illinois Central R. Co., 299 U.S. 334, 335, 346, 347, 57 S.Ct. 277, 279, 280, 81 L.Ed. 270. And while Congress may not exercise its control over the mails to enforce a requirement which lies outside its constitutional province, when Congress lays down a valid regulation pertinent to the use of the mails, it may withdraw the privilege of that use from those who disobey. Champion v. Ames, supra; Lewis Publishing Co. v. Morgan, 229 U.S. 288, 33 S.Ct. 867, 57 L.Ed. 1190."

The Securities Act of 1933, as amended, 15 U.S.C.A. § 77a et seq., does not attempt to regulate or prohibit the sale of securities in intrastate commerce. It merely provides as a condition precedent to the use of the mails and the facilities of interstate commerce that the issuer file a registration statement containing a true and complete statement of the information required by Section 7 of the Act, 15 U.S. C.A. § 77g, in order to protect the public against imposition and fraud in the sale of securities through the use of the mails or the facilities of interstate commerce; and as a deterrent against the filing of a false or misleading statement, subjects the persons responsible for such a statement or who participate in the making thereof to civil liabilities in favor of any person acquiring the security without knowledge of the false or misleading character thereof. See Section 11 of the Act, 15 U.S.C.A. § 77k. It is well settled that Congress may enact reasonable regulations to prevent the

---

[2] See Alabama & New Orleans Transportation Co. v. Doyle, D.C.Mich., 210 F. 173, 182, 183; Wm. R. Compton Co. v. Allen, D.C.Iowa, 216 F. 537, 546; Bracey v. Darst, D.C.W.Va., 218 F. 482, 495; N. W. Halsey & Co. v. Merrick, D. C.Mich., 228 F. 805; Geiger-Jones Co. v. Turner, D.C.Ohio, 230 F. 233, 239. See, also, Hall v. Geiger-Jones Co., 242 U.S. 539, 558, 37 S.Ct. 217, 61 L.Ed. 480, L.R.A.1917F, 514, Ann.Cas.1917C, 643.

mails and the facilities of interstate commerce from being used as instruments of fraud and imposition. We conclude that the Act is within the constitutional powers of Congress.[3]

## 2. The Motion to Dismiss and the Application to Withdraw.

15 U.S.C.A. § 77h(d) reads in part as follows:

"If it appears to the Commission *at any time* that the registration statement includes any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading, the Commission may, after notice * * * and after opportunity for hearing * * * issue a stop order suspending the effectiveness of the registration statement." (Italics ours.)

■ A stop order serves two purposes: First, it suspends the effectiveness of the registration statement and the license of the issuer to use the mails and the facilities of interstate commerce for the purposes recognized by the act; second, it operates as a warning to the investing public that the Commission has found that the statement is untrue or misleading and, therefore, unreliable.

■ Transactions by a dealer within one year after the first date upon which the security was bona fide offered to the public by the issuer are not exempted from the provisions of Section 5 of the Act, 15 U.S.C.A. § 77e. See § 77d(1) and H.R.Rep. 85, 73d Cong. 1st Sess.1933, p. 16. On February 11, 1937, 4318 units were still in the hands of dealers and they did not acquire an exempt status until February 23, 1937. Hence, the ground set up in the motion, that all the securities had passed from the hands of the issuer, was an insufficient basis upon which to challenge the jurisdiction of the Commission to issue a stop order.

The regulation of the Commission with respect to withdrawal of the registration statement reads:

"Any registration statement or any amendment thereto may be withdrawn upon the application of the registrant if the Commission, finding such withdrawal consistent with the public interest and the protection of investors, consents thereto. The application for such consent shall be signed by the registrant and shall state fully the grounds upon which made. The fee paid upon the filing of the registration statement will not be returned to the registrant. The papers comprising the registration statement or amendment thereto shall not be removed from the files of the Commission but shall be plainly marked with the date of the giving of such consent, and in the following manner: 'Withdrawn upon the request of the registrant, the Commission consenting thereto.'"

In Jones v. Securities & Exch. Commission, 298 U.S. 1, 22, 56 S.Ct. 654, 660, 80 L. Ed. 1015, the court said:

"The question under the regulation is whether due regard to the public interest and the protection of investors requires that the withdrawal be denied. The test is the absence or presence of prejudice to the public or investors; * * *."

■ The manifest purpose of the Act is to protect the public against imposition and fraud in the sale of securities through the use of the mails or the facilities of interstate commerce. Section 7 of the Act, 15 U.S.C.A. § 77g, requires the issuer to file a true and complete statement of the information specified in Schedule A, 15 U.S.C.A. § 77aa, in order to make available to the investing public pertinent and reliable information relating to the security and thereby effectuate the purpose of the Act.

Section 6(d) of the Act, 15 U.S.C.A. § 77f(d), expressly provides that the information contained in the registration statement shall be available to the public; and the filing of an untrue or misleading registration statement subjects to civil liabilities every person who signed the registration statement, every person who was a director of, or person performing similar func-

---

[3] The constitutionality of the Securities Act of 1933 has been sustained in whole or in part by the Second, Fifth, Sixth, Seventh, and Ninth Circuits. See Jones v. Securities and Exchange Commission, 2 Cir., 79 F.2d 617, reversed on other grounds, 298 U.S. 1, 56 S.Ct. 654, 80 L. Ed. 1015; Securities and Exchange Commission v. Jones, 2 Cir., 85 F.2d 17; McMann v. Securities and Exchange Commission, 2 Cir., 87 F.2d 377, 109 A.L.R. 1445; Newfield v. Ryan, 5 Cir., 91 F.2d 700, certiorari denied 302 U.S. 729, 58 S. Ct. 54, 82 L.Ed. 563; Bogy v. United States, 6 Cir., 96 F.2d 734; Securities and Exchange Commission v. Crude Oil Corp. of America, 7 Cir., 93 F.2d 844, 848, 849; Coplin v. United States, 9 Cir., 88 F.2d 652, 656, 657.

tions, or partner in, the issuer at the time of the filing of the registration statement, every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner, every accountant, engineer, or appraiser who participated in making the registration statement, and every underwriter with respect to such security. See Section 11 of the Act, 15 U.S.C.A. § 77k.

■ We do not agree with the contention that when all the securities had been disposed of by the issuer and its dealers the purpose of the registration statement was fully served and hence there was no need for a stop order. It does not follow when the securities pass out of the hands of the issuer and the dealers that they cease to be the subject-matter of sales in interstate commerce, and that the mails and facilities of interstate commerce cease to be used to effectuate their sales. In fact, the opposite is obviously true. Furthermore, members of the investing public might acquire the information contained in the registration statement during the time the securities are being sold by the issuer and its dealers, and might place reliance thereon in purchasing such securities from third persons after they have all passed out of the hands of the issuer and its dealers. Obviously, so long as the securities are outstanding, purchases thereof will continue to be made in reliance on the registration statement, unless notice of its unreliability is given by a stop order.

Moreover, because of the provisions of Section 77k, supra, the registration statement continues to serve a purpose after the securities have passed out of the hands of the issuer and its dealers. That section is not limited to purchases from the issuer or its underwriter or dealer, but broadly covers all persons who purchase the security in reliance on the registration statement.[4] And when the issuer files its registration statement, sells its securities, and places them in the channels of trade and commerce where they are likely to be sold by pur-

chasers from the issuer or its dealers to third persons, the registration statement must remain on file for the benefit of such third persons. The issuer cannot file a false and misleading registration statement, issue and sell all its securities, place them in the channels of trade and commerce, and then withdraw the statement and avoid the liabilities imposed by Section 77k, supra.

■ It follows that even where the securities have all passed from the hands of the issuer and its dealers and have reached an exempt status with respect to Section 5 of the Act, 15 U.S.C.A. § 77e, it is important with respect to the second purpose of a stop order that the Commission have power to issue its order as the Act provides "at any time" it appears to the Commission that the statement is untrue or misleading.

An unavoidable defect in this type of security regulation flows from the fact that certain members of the public attribute higher value and greater soundness to the security merely because it has been subjected to governmental scrutiny and the issuer has complied with the provisions of the regulatory act.[5] This fact makes it all the more important that the Commission, when it finds that the registration statement is untrue or misleading, be empowered to issue a stop order as a warning to the investing public.

■■ We have said that Congress, as a condition precedent to the use of the mails and the facilities of interstate commerce, has power to require the filing of the registration statement, and in order to prevent imposition and fraud in the use of the mails and the facilities of interstate commerce, to make the statement available to the investing public. A registration statement that has been filed and become effective and available to the public, if untruthful or misleading, is likely to result in prejudice to the investing public; and we have no doubt that Congress, as an incident to its general power, may provide for a stop

---

[4] H.R.Rep. 85, 73 Cong. 1st Sess.1933, p. 10.

[5] The Act undertakes to avoid this consequence by the provisions of § 23, 15 U.S.C.A. § 77w, which reads as follows:

"Neither the fact that the registration statement for a security has been filed or is in effect nor the fact that a stop order is not in effect with respect thereto shall be deemed a finding by the Com-

mission that the registration statement is true and accurate on its face or that it does not contain an untrue statement of fact or omit to state a material fact, or be held to mean that the Commission has in any way passed upon the merits of, or given approval to, such security. It shall be unlawful to make, or cause to be made, to any prospective purchaser any representation contrary to the foregoing provisions of this section."

order to warn the investing public against an untrue or misleading registration statement. Certainly, it has power to guard against the harm that is likely to flow from the untruthfulness or misleading character of an official document required to be filed in the exercise of its legitimate power. Mere withdrawal of an untrue or misleading statement would not be enough. The positive effect of a stop order is essential to the full protection of the public.

█ Finally, there can be no doubt that the registration statement was effective when the Commission initiated the proceeding. The purpose of the motion to dismiss and of the application to withdraw was to stifle the inquiry and avoid the stop order. What the late Mr. Justice Cardozo said in his dissenting opinion in Jones v. Securities & Exch. Commission, 298 U.S. 1, 32, 56 S.Ct. 654, 664, 80 L.Ed. 1015, is apposite: "To permit an offending registrant to stifle an inquiry by precipitate retreat on the eve of his exposure is to give immunity to guilt; to encourage falsehood and evasion; to invite the cunning and unscrupulous to gamble with detection."

We accordingly conclude that the motion to dismiss and the application for withdrawal were properly denied.

### 3. The Findings of the Commission.

The Commission found that the registration statement was materially deficient in Items 13 and 39 in that it failed to name F. C. Hall as a promoter, and failed to reveal the profits realized by him from the sale of the leases acquired by the Trust; in Item 14 in affirmatively stating that the Trust intended to render quarterly reports, when in fact it had no such intention; in Item 17 in failing to disclose litigation pending at the time the registration statement became effective which might affect the value of the securities to be offered; in including in such registration statement engineering reports which were inaccurate, incomplete, and misleading; and in misstating in the prospectus the present revenues from the properties to be acquired by the Trust.

Schedule A of the Act, 15 U.S.C.A. § 77aa, requires the registration statement to set forth the names and addresses of the promoters "in the case of a business to be formed, or formed within two years prior to the filing of the registration statement." The registration statement did not set forth the name and address of Hall as a promoter.

Brown, Diffie, and Shanks were trustees of the Southwest Trust. Prior to December 6, 1935, Hall agreed with Brown to convey certain oil and gas leases to the Southwest Trust and to advance the money for the acquisition of additional oil and gas leases in Texas. Brown and Diffie purchased several Texas leases with moneys advanced by Hall. Hall inspected only one of the leases. On December 6, 1935, Hall entered into a contract for the sale of the Oklahoma and Texas leases to the Southwest Trust for a consideration of $759,961.25, to be paid in six installments of $105,000 each on January, February, March, April, May, and June 25, 1936, respectively, and one installment of $129,961.-25 on July 25, 1936. These leases cost Hall $535,654.59. The registration statement did not disclose the profit to be realized by him from the sale to the Southwest Trust.

On December 6, 1935, the Southwest Trust executed an assignment of the contract to Brown, Diffie, Shanks, and Van Horn,[6] as trustees for a trust to be created on the following day under the name of Oklahoma-Texas Trust, for a consideration of $909,500, to be paid in six installments of $125,661 each on January, February, March, April, May, and June 25, 1936, respectively, and one installment of $155,534 on July 25, 1936. Out of such payments, Brown, Diffie, Van Horn and Shanks were required by the assignment to pay the installments provided for in the contract between Hall and the Southwest Trust. By the terms of the assignment the liability of the Trust and its trustees was limited to the proceeds received from the sale of participating units in the Trust. Hall testified that the Southwest Trust could cancel its contract with him at any time and suspend further payment of installments.

In Cook on Corporations, 6th Ed., § 651, a promoter is defined as follows: "A promoter is a person who brings about the incorporation and organization of a corporation. He brings together the persons who become interested in the enterprise, aids in procuring subscriptions, and sets in

---

[6] Van Horn was an employee of the Southwest Trust.

motion the machinery which leads to the formation of the corporation itself."

See, also, Fletcher Cyc. Corporations, Perm. Ed., Vol. 1, § 189; Dickerman v. Northern Trust Co., 176 U.S. 181, 203, 20 S.Ct. 311, 44 L.Ed. 423; Luft v. Strobel, 322 Mo. 955, 19 S.W.2d 721.

One may be a promoter notwithstanding he does not become connected as a shareholder with the company that is formed.[7]

In Ex-Mission Land & Water Co. v. Flash, 97 Cal. 610, 32 P. 600, 604, the court said: "The word 'promoter' has no technical legal meaning, and applies to any person who takes an active part in inducing the formation of a company, whether he afterwards becomes connected with the company or not."

We think it is a fair inference from the evidence that Hall, Brown, Diffie, and Shanks planned the formation of the Trust prior to December 6, 1935. The payment to Hall of the consideration for his contract of sale to the Southwest Trust was wholly contingent upon the payments to be made by the Trust under the terms of the assignment, which in turn was contingent upon a sale by the Trust of its participating units. Hall was an active participant in the entire plan. He advanced the money for the purchase of the leases. He entered into a contract for the sale of the leases to the Southwest Trust, which on the same day assigned the contract to the Trust to be formed. Under the arrangement, the Southwest Trust was under no binding obligation to make the payments to Hall. They were to be made directly by the trustees to Hall from the proceeds realized from the sale of participating units in the Trust. We conclude there was substantial evidence to sustain the finding that Hall was a promoter of the Trust.

Item 14 of the registration statement called for the frequency, nature, and scope of reports to stockholders. The answer given in such statement was that quarterly reports showing receipts, expenditures, and disbursements for the preceding quarter would be given. Van Horn, one of the trustees, testified that they had no way of obtaining information for such reports because Hall, under the purchase contract,

kept all the revenues from the property and paid all expenses, and that "it was not our intention in answering that item in the registration statement that the reports would be made during the selling of the" units. Item 14 calls for a statement of present intention. The evidence discloses such statement to be false. This was a misstatement of a fact. Donaldson v. Farwell, 93 U.S. 631, 633, 23 L.Ed. 993.

The seriousness of the failure to make these quarterly statements during the period the units were being offered by the Trust to the public becomes more apparent when considered in the light of the misstatements respecting net income contained in the prospectus. In its prospectus the Trust stated that the present revenues from the properties to be acquired by it approximated $20,000 per month after deducting the estimated operating costs. The evidence disclosed that the net income from such properties for the month of December, 1935, was $9,022.08, for January, 1936, $12,504.66, and for February, 1936, $8,920.-37.

Item 17 of the registration statement calls for a "statement of all litigation pending, if any, that may materially affect the value of the security to be offered, describing briefly the origin, nature, and name of parties to such litigation." The Trust's answer to this question was "None."

Rule 37 of the Texas Railroad Commission reads as follows: "No well shall hereafter be drilled for oil or gas at any point less than six hundred and sixty (660) feet from any drilling or completed well; and no well shall hereafter be drilled for oil or gas at any point less than three hundred and thirty (330) feet from any property or division line; provided, however, the Commission in order to prevent waste or to protect vested rights, or to protect any property against undue drainage by reason of the operation of the wells of any other operator, will, after hearing, grant exceptions permitting drilling within a less or shorter distance than hereinabove prescribed, upon application duly filed fully stating the facts, notice of such application and hearing having been first given to all adjacent lessees affected thereby; provided, that if all adjacent lessees affected thereby

---

[7] Armstrong v. Sun Printing & Publishing Ass'n, 137 App.Div. 828, 122 N.Y. S. 531; Ex-Mission Land & Water Co. v. Flash, 97 Cal. 610, 32 P. 600, 604; Bigelow v. Old Dominion Copper Mining & Smelting Co., 74 N.J.Eq. 457, 71 A. 153, 171; Luft v. Strobel, 322 Mo. 955, 19 S.W.2d 721; Fletcher Cyc. Corporations, Perm.Ed., Vol. 1, § 189, p. 595; Morawetz, Private Corporations, § 545.

waive in writing, notice of hearing on or objection to the granting of said application, the Commission may proceed to determine such application without hearing; and, provided further that in cases of forced offsets the Commission may grant exceptions without waivers or hearing when it is evident that the wells desired are necessary to protect the properties on which it is proposed to drill them."

See Brown v. Humble Oil & Refg. Co., 126 Tex. 296, 83 S.W.2d 935, 939, 940, 99 A.L.R. 1107.

In the case last cited the court held that the action of the Railroad Commission in granting an exception under the proviso to Rule 37 must be based upon proof and must not be capricious or unreasonable, and that its action is subject to judicial review.[8] But the ruling of the Railroad Commission is presumed to be valid and will not be set aside unless it is clearly illegal, unreasonable, or arbitrary.[9]

The Railroad Commission of Texas had granted two exception permits under the proviso to Rule 37 for the drilling of two wells on a five-acre lease in Texas belonging to the Trust. On the effective date of the registration statement, two suits were pending in the district court of Travis County, Texas, brought by adjoining landowners to enjoin the drilling of wells under the permits and to set aside the permits. The Trust was not a party to such suits, but the attorney for Hall, who examined the title to the lease, and Diffie, who negotiated the purchase of the lease, had knowledge of the pendency thereof. The suits were predicated upon allegations that the facts did not justify the granting of the permits. In one case, a plea in abatement had been sustained and the petition amended by leave of court.

Counsel for the Trust assert that these suits are frivolous and without merit. This assertion is open to question, and whether it is correct cannot be determined with certainty until the litigation has been terminated. Should either of the suits be successful, the amount of oil recoverable from the lease will be substantially decreased and the value of the lease materially affected. The answer in the registration statement should have disclosed the pendency of this litigation. If the registrant believed it to be without merit, it could have so stated in its answer.

One portion of an engineering report signed by Lon B. Turk and attached to the registration statement as an exhibit, deals with the Tuleta-Skinner-Harris lease. It was actually prepared by Turk's partner Richards upon information received by him from Snider, a geologist, who in turn received his information from one Dirks, an owner of the Tuleta Oil Company. Snider reported to Richards that the field was about exhausted unless pumping was resorted to, but this fact was not disclosed in the report. This report also stated that the allowable production since June, 1935, had been 35 barrels per day, whereas in fact, it was 22 barrels in November, 1935, and 20 barrels in January, 1936, and it did not disclose that the lease had failed to make its allowable during the period from August, 1935, to January, 1936, inclusive. The report further stated that "there have been no wells completed in the shallower sand (Cole sand zone at 1100 feet above the Pettus sand) on this property." Prior to February 19, 1936, of the eight wells on the lease two had ceased to produce from the Pettus and had been plugged back to the Cole and were producing therefrom in small quantities. A portion of the report covered the Sunray-Fain County lease. Turk testified that after November 1, 1935, there were adverse developments on this lease which rendered his report inaccurate and too optimistic; that there was an encroachment of water; that several surrounding wells were producing water ranging as high as 55 per cent on November 1, 1935; that during November well No. 1 began cutting water; and that well No. 3 cut water and finally went dead in December, 1935. Brown and Diffie knew about the water development on this lease at the time the registration statement was filed. Sometime after the first of Janu-

8 See, also, Brown v. Humble Oil & Refg. Co., 126 Tex. 296, 87 S.W.2d 1069, 101 A.L.R. 1393; Railroad Commission of Texas v. Magnolia Petroleum Co., 130 Tex. 484, 109 S.W.2d 967.

9 Brown v. Humble Oil & Refg. Co., 126 Tex. 296, 87 S.W.2d 1069, 101 A.L. R. 1393; Id., 126 Tex. 296, 83 S.W.2d 935, 99 A.L.R. 1107; Railroad Comm. v. Magnolia Petroleum Co., 130 Tex. 484, 109 S.W.2d 967; Smith County Oil & Gas Co. v. Humble Oil & Refining Co., Tex.Civ.App., 112 S.W.2d 220; Ortiz Oil Co. v. Deep Rock Oil Corp., Tex.Civ. App., 112 S.W.2d 210.

ary they induced Hall to credit the purchase price with $50,000 on account of the water.

This report further states that the Chatham-Lindsay lease "will undoubtedly prove to be the outstanding fertile tract of the entire Oklahoma field." Prior to February 19, 1936, four of the eight wells surrounding this lease had ceased to produce and the other surrounding wells were declining in production.

We conclude that the findings of the Commission were supported by substantial evidence and should be sustained and that the stop order was properly issued.

The order is accordingly affirmed.